## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Fagen, Inc., a Minnesota corporation, and
Midwest Ethanol Transport, LLC, a
Minnesota limited liability company,

     Plaintiffs/Counter-Defendants
     /Third-Party Plaintiffs,

v.

Exergy Development Group of Idaho,
L.L.C., an Idaho limited liability company,
and James T. Carkulis, individually,

     Defendants/Counter-Plaintiffs,

and

Exergy Development Group of Idaho,
L.L.C., and James T. Carkulis,

     Defendants/Counter-Plaintiffs/
     Crossclaimants,

v.

Hawley Troxell Ennis & Hawley LLP,

     Crossdefendants,

and

Fagen, Inc.,

**MEMORANDUM OF LAW
& ORDER**
Civil File No. 12- 2703 (MJD/SER)

1

Third-Party Plaintiff,

v.

Hawley Troxell Ennis & Hawley LLP,

Third-Party Defendant.

---

Angelo L. Rosa, Marsh Rosa LLP, and Michael F. Cockson, Faegre Baker Daniels, LLP, Counsel for Exergy Development Group of Idaho, LLC and James T. Carkulis.

Keith S. Moheban and Timothy M. Kelley, Stinson Leonard Street, LLP, Counsel for Fagen, Inc. and Midwest Ethanol Transport, LLC.

---

## I.     INTRODUCTION

This matter is before the Court on motion for summary judgment by

Defendants Exergy Development Group of Idaho, LLC ("Exergy") and James T.

Carkulis (collectively "Defendants") on Counts I, II, III and VI of the Amended

Complaint.  [Docket No. 168]   The parties appeared for oral argument on

November 21, 2014.  For the reasons set forth below, the Court grants

Defendants' motion with respect to Counts I, III and VI of the Amended

Complaint, but denies the motion with respect to Count II.

## II.     BACKGROUND

### A.     Factual Background

### 1.    The Big Blue Project

The instant action arises out of a dispute over a thirty-six megawatt wind farm project near Blue Earth, Minnesota (the "Big Blue Project").  (Declaration of Jennifer A. Johnson ("Johnson Decl.") ¶ 7 [Docket No. 10].)

The Big Blue Project was structured as a series of parent/subsidiary companies.  (Id. ¶ 5.)  Initially, Defendant Exergy was the sole member of Exergy Minnesota Holdings, LLC ("Exergy Minnesota").  (Id.)  Exergy Minnesota was the sole member of Minnesota Wind Partners I, LLC ("Minnesota Wind"), which was in turn the sole member of Big Blue Wind Farm, LLC ("Big Blue"), which owned the Big Blue Project.  (Id.)  Defendant Carkulis is the sole owner of Defendant Exergy.  (Declaration of James T. Carkulis ("Carkulis Decl.") ¶ 1 [Docket No. 170].)

Northern States Power Company ("NSP") contracted to purchase electricity from the Big Blue Project pursuant to a Renewable Energy Purchase Agreement with Big Blue ("PPA").  (Declaration of Keith S. Moheban ("Moheban Decl."), Ex. G [Docket No. 174].)

### 2.    Fagen's Relationship with Exergy

Exergy Minnesota hired Plaintiff Fagen, Inc. ("Fagen") to serve as the general contractor for the Big Blue Project.  (Johnson Decl. ¶ 7.)  Fagen is a green

energy design build construction contractor.  (Id. ¶ 2.)  Plaintiff Midwest Ethanol

Transport, LLC is an affiliate of Fagen owned by the Fagen family.  (Id.)

When Exergy was unable to obtain financing for the cost of acquiring,

constructing, and operating the Big Blue Project, Fagen provided financing.  (Id.

¶¶ 8-9.)  The parties entered into a series of agreements related to the transaction.

(Id. ¶¶ 8-12.)

### a)      The Purchase Agreement

The Limited Liability Company Interest Purchase Agreement (the

"Purchase Agreement") between Fagen and Exergy is dated February 29, 2012.

(Moheban Decl., Ex. A.)   In exchange for additional credit and a reduction in

Exergy's outstanding obligations to Fagen by approximately $11 million, Exergy

"convey[ed] to Fagen ninety-nine (99) units of the 100 outstanding units of

membership interest in [Exergy Minnesota], which units constitute 99% of the

membership interest in [Exergy Minnesota]."  (Id. §§ 2, 3.)

### b)      The Member Control Agreement

Fagen and Exergy also entered into the First Amended and Restated

Member Control Agreement of Exergy Minnesota ("MCA"), effective February

29, 2012.  (Moheban Decl., Ex. B.)  The MCA confirms Fagen's ownership of 99

out of the 100 outstanding membership units of Exergy Minnesota.  (<u>Id.</u> § 2.2.)

The MCA provides that:

> **2.8    Purchase Option.** As soon as Exergy has Repayment Capital (defined below), but no later than June 29, 2012, Exergy shall have the obligation and option to purchase the Units owned by Fagen for a purchase price equal to $11,447,503.02, together with interest accrued thereon from and after February 29, 2012 at an interest rate equal to 10% per year (the "Option Purchase Price"). . . .  If Exergy fails to exercise the purchase in the manner described herein, on or before June 29, 2012, the purchase option shall automatically expire and be of no further force or effect.  <u>If the Units owned by Fagen are not repurchased by June 29, 2012, the Units owned by Exergy shall automatically transfer to Fagen, such that Fagen is the owner of one hundred percent (100%) of the Units, and Exergy shall no longer be a Member and shall have no rights as a Member as of such date.</u> . . .

(<u>Id.</u> § 2.8 (emphasis added).)

The parties designated Exergy as Managing Member, Carkulis as the President and Chief Financial Officer, and Elizabeth Woolstenhulme as Secretary of Exergy Minnesota.  (<u>Id.</u> §§ 3.1, 3.5.7.)  They agreed that:

> Fagen shall have the right to remove Exergy as the Managing Member of the Company and elect or appoint a new Managing Member upon the occurrence of any of the following events:
>
> . . .
>
> (e) Exergy does not timely exercise its option to purchase the Units owned by Fagen contained herein; . . .

(<u>Id.</u> § 3.4.1.)  Also:

> Any officer may be removed as such, either with or without cause, by the Managing Member at any time.  Any vacancy occurring in any office of the Company may be filled by the Managing Member.

(Id. § 3.5.10.)

The MCA is governed by Minnesota law.  (Id. § 9.3.)

### 3.    Fagen Asserts Ownership of Exergy Minnesota

When Exergy failed to exercise the purchase option by June 29, 2012, Fagen took the position that Exergy's remaining one percent interest in Exergy Minnesota was transferred to Fagen and Fagen asserted sole ownership of Exergy Minnesota.  (Johnson Decl. ¶ 13.)  Fagen later transferred ownership of Exergy Minnesota to Midwest.  (Id. ¶ 16.)

On August 29, 2012, Fagen, acting as the sole member of Exergy Minnesota, adopted a written resolution removing Exergy as Managing Member of Exergy Minnesota and Carkulis and Woolstenhulme as officers pursuant to sections 3.4.1(e) and 3.5.10 of the MCA.  (Id., Ex. E.)  The same day, Fagen notified Exergy that it had been removed as Managing Member and that Carkulis and Woolstenhulme were no longer officers.  (Moheban Decl., Ex. D.)  In the notice, Fagen demanded that Carkulis, Woolstenhulme, and Exergy "immediately cease taking any action on Exergy Minnesota's behalf and cease holding [themselves] out as the managing member or officers of Exergy

6

Minnesota."  (<u>Id</u>.)  Fagen further demanded the return of Exergy Minnesota's

stock certificates, business records, construction plans, and corporate documents

in Exergy's possession by September 5, 2012.  (<u>Id.</u>)

Defendants returned boxes of documents to Fagen, including unpaid

invoices that were due and payable.  (Johnson Decl. ¶ 15.)  On September 5, 2012,

Exergy sent Fagen an invoice for more than $2.6 million relating to the

"Development of Big Blue Wind Farm" for "71 months of development."

(Moheban Decl., Ex. F.)

### 4.    Telephone Call with NSP

According to Exergy, in late August/early September 2012, Exergy began

receiving telephone calls from NSP regarding the Big Blue Project, demanding to

speak to Carkulis.  (Carkulis Decl. ¶¶ 2-3.)  Carkulis claims that he was reluctant

to speak to NSP based on Fagen's control of the project and advice of counsel.

(<u>Id.</u> ¶ 4.)  However, after Exergy employees "insisted it was imperative that NSP

hear from [Carkulis]," he participated in a telephone call with NSP

representatives by the names of "Howard" and "Dana."  (<u>Id.</u> ¶ 5.)

Carkulis contends that NSP questioned him about a letter sent by or on

behalf of Fagen to NSP.  (<u>Id.</u> ¶ 6.)  Carkulis responded that he did not know the

contents of the referenced letter.  (Id.)  NSP replied that the letter was

confidential or Fagen's attorneys said the contents could not be revealed.  (Id.)

According to Carkulis, when NSP asked him about a change in ownership

of the Big Blue Project, he responded that he "did not know who owned the

project."  (Id. ¶ 7; Id. Ex. B., Deposition of James T. Carkulis ("Carkulis Dep.")

172.)  When told that the letter from Fagen implied that Fagen owned the Big

Blue Project, Carkulis stated that he was "unsure of the status without knowing

what the letter specifically stated." (Carkulis Decl. ¶ 7.)

Carkulis admits that at that time of this telephone call, he was aware that

he had been removed as Exergy Minnesota's Managing Member, that Fagen was

asserting sole ownership of the Big Blue Project and that Fagen had instructed

him not to take any actions on behalf of the Big Blue Project.  (Id.; Carkulis Dep.

169-170.)  Nonetheless, he maintains that at the time of the call, he was unsure of

the ownership status of the project because Exergy's legal counsel told him that

Fagen was required to foreclose on its ownership interest before assuming

ownership of the Big Blue Project.  (Carkulis Decl. ¶ 8; Carkulis Dep. 170-171.)

According to Carkulis, his response was also influenced by NSP's suggestion

that if the representations in the letter sent by Fagen were true, they could trigger

potential violations of the change of control provisions of the PPA or Minnesota's administrative rules.  (Carkulis Decl. ¶ 8; Carkulis Dep. 172-73.)  Because he did not want to jeopardize the project, he simply stated that he did not know.  (Id.)

Carkulis denies ever telling NSP during this call or any time thereafter that Exergy had control over the Big Blue Project.  (Carkulis Decl. ¶ 10.)  Instead, he claims he told NSP that he was "unsure of [the] status."  (Id.)

Carkulis also asserts that during this call, NSP inquired about the status of the latest monthly progress report, required under the PPA.  (Id. ¶ 9; Carkulis Dep. 173.)  Carkulis replied that he did not know the status of the monthly submittal.  (Id.)  A few days later, Carkulis claims that NSP demanded, by letter, a monthly progress report on the Big Blue Project and stated that the failure to provide a report would constitute a default under the PPA.  (Carkulis Decl. ¶ 11; Carkulis Dep. 173.)

### 5.    The October 5, 2012 Big Blue Wind Farm Progress Report

In response to NSP's repeated requests for a progress report, Exergy claims that it contacted Fagen, but received no answer.  (Carkulis Decl. ¶12; Carkulis Dep. 174.)  Exergy further claims that its legal counsel told Exergy to submit a progress report because, if Exergy did not and the project went into default, Fagen could file suit against Exergy.  (Carkulis Decl. ¶ 12; Carkulis Dep. 174.)

On October 5, 2012, Exergy submitted a "Big Blue Wind Farm Progress

Report" to NSP ("Progress Report").  (Carkulis Decl., Ex. A.)  The Progress

Report stated, in relevant part:

> Exergy would like to take this opportunity to update Xcel on the
> progress and construction status of the Big Blue Wind Farm.
>
> . . .
>
> - Gamesa began turbine delivery September 17th
>
> - Turbine erection began September 17th
>
> - Turbines are being commissioned as they are delivered; as the
>   grid is available through the energized substation, the two
>   collection circuits can be segregated and individual turbines
>   commissioned
>
> - To date, three complete turbines have been delivered and
>   erected
>
> - Base tower sections have been installed on about half of the
>   remaining turbines
>
> - Fagen and Gamesa are both on schedule
>
> - No significant on-site issues to report
>
> Please let us know if you have any questions or require any further
> documentation.  We will continue to keep Xcel updated on the
> construction progress of the Big Blue Wind Farm.

(Id.)

Carkulis insists that the information in the Progress Report reflected

Exergy's last-known information concerning the project, to the best of its

knowledge.  (Carkulis Decl. ¶ 14.)  He believed that this communication was

necessary "out of concern for the viability of the [Big Blue Project] and for Fagen

. . . given a failure by Fagen to communicate with Exergy despite several

attempts by members of the Exergy team to reach out to Fagen and its counsel."

(Id. ¶ 15.)

### 6.    NSP Responds to Fagen and Exergy

On October 12, 2012, NSP sent a letter to Carkulis, Woolstenhulme and

Fagen to "ensure that [Big Blue] is fully aware of certain recent communications

pertaining to the project and NSP's concern about those communications . . . ."

(Moheban Decl., Ex. I.)  In the letter, NSP explained:

> . . . Since the inception of the PPA, the primary communications
> regarding this project have come from Mr. Carkulis and other
> representatives of [Exergy] and its affiliates.  Exergy representatives
> have held themselves out as the owner of [Big Blue] and the
> authorized representatives of the project and have provided NSP
> with periodic updates about the project.  NSP has relied on those
> communications as being truthful and appropriate under the PPA.
>
> Recently, however, NSP has received communications from
> representatives of [Fagen].  Fagen has stated that it is now the sole
> owner of [Big Blue], that Fagen has taken over control of the
> ongoing development of the project, and Fagen has requested that
> NSP communicate with [Big Blue] through Fagen. . . .
>
> NSP has questioned Mr. Carkulis about these communications from
> Fagen and was told Fagen has sent some letters to Exergy but that
> the underlying transaction remains in place and that Exergy

anticipates its issues with Fagen will be worked out soon. Despite those assurances by Exergy, NSP continues to be told by Fagen that Exergy is no longer involved in the development of the project. And most recently, NSP has received competing monthly project updates from both Exergy and Fagen.

NSP is understandably concerned about these conflicting and confusing communications. . . . NSP does not want to become embroiled in any disputes [Big Blue] has with other parties including Exergy or Fagen.

Further, to the extent that the ownership of [Big Blue] is changing or has changed as a result of the apparent disputes, NSP notes that the PPA has specific requirements for implementing changes of control of [Big Blue]. . . . NSP requests an explanation from [Big Blue] of the current ownership structure of [Big Blue] and [its] ongoing compliance with the PPA. . . .

Finally, NSP notes that the communications from both Exergy and Fagen create substantial confusion as to the implementation of NSP's payment obligations under the PPA. Specifically, to the extent that competing claims have been asserted as to the ownership of the project, NSP is concerned that any payment required under the PPA be directed to the appropriate person or entity. NSP has a well-founded concern that conflicting claims to payments under the PPA may be made and NSP is unwilling to accept the risk that it may be called upon to pay any invoice twice.

(Id. (emphasis added).) In light of this information, NSP intended "to place all amounts owed under the PPA into an interest-bearing escrow account to be released to [Big Blue] once NSP has received adequate assurances from all parties that the dispute has been satisfactorily resolved." (Id.) If the parties did not

agree to the escrow account, NSP threatened to commence an interpleader action.  (Id.)

### 7.    Exergy Requests Payment of Additional Development Costs

In an October 5, 2012, e-mail from counsel for Exergy to Plaintiffs' counsel, Exergy indicated that it was "willing to cooperate and assist in Fagen's efforts to complete the [Big Blue Project], assuming Fagen confirms its intention to pay Exergy's development costs incurred to date." (Moheban Decl., Ex. J.)  The e-mail explained that Exergy had been contacted by vendors and law firms about the status of the project, but "[did not] know what to tell them."  (Id.)  It described an account of NSP's telephone call with Carkulis:

> In addition, Xcel called James on Wednesday and advised him that you delivered a letter asserting that Fagen has taken over ownership of the Big Blue Project.  Xcel folks are concerned on several fronts: Who now owns Big Blue?  If Fagen has taken over, why was there no notice of change of control as required by the PPA?  If Fagen has taken over, the project is no longer CBED qualified and the PPA is terminable according to its terms.  Again, James did not know what to tell Xcel because you and Fagen have not responded to Exergy's and my request for information about Fagen's plans for the project and the disposition of Big Blue project development costs. . . .
>
> As you know, you and I have disagreed about the legal effect of the Exergy MN Holdings 99% membership interest transfer; and it's my belief that Fagen does not legally own the Project unless and until it complies with UCC foreclosure procedures.  But if Fagen confirms its intention to pay or reimburse the development costs properly

> incurred by Exergy and chargeable to the Big Blue Project, then the
> legal question becomes a non-issue[.]

(Id.)

On November 28, 2012, Exergy submitted an invoice to Big Blue "c/o

Fagen, Inc." for over $18 million in "Development Costs."  (Moheban Decl., Ex.

K.)

**B.    Procedural Background**

Plaintiffs initiated this lawsuit in Faribault County District Court on or

about October 12, 2012, and the action was removed on October 23, 2012.

[Docket No. 1]

On October 26, 2012, Plaintiffs filed a motion for Temporary Restraining

Order or Emergency Injunctive Relief, seeking a declaration that Fagen is the

100% owner of Exergy Minnesota, that Defendants are not officers or members of

that entity, and enjoining Defendants from holding themselves as being owners

of the Big Blue Project, among other forms of relief.  [Docket No. 7]

On November 1, 2012, the parties filed a stipulation resolving ownership

of the Big Blue Project and withdrawing the motion ("Stipulation").  [Docket No.

15]  The Court entered an Order adopting the Stipulation, stating that:

> 1.     . . . [Fagen] has acquired ownership of [Exergy Minnesota]
> through transactions it entered into with [Exergy].   Accordingly,

14

none of the Defendants assert any present ownership or control of Exergy Minnesota, and they hereby waive and disclaim any right to assert or seek future ownership or control of Exergy Minnesota.

2.     . . . Fagen has transferred ownership of Exergy Minnesota to Midwest Ethanol Transport, LLC ("Midwest"), and none of the Defendants challenge the validity of that transfer of ownership.

3.     . . . Midwest now has sole ownership and control of the [Big Blue] Project

. . .

5.     Defendants stipulate and agree that they will take no action purporting to be on behalf of the Project, that they will not instruct others to do so, and that they will make no communications to any party that they have ownership of, responsibility for, or are acting on behalf of, the Project, except with advance written authorization from Plaintiffs. . . .

[Docket No. 16]

On November 26, 2012, Plaintiffs filed an Amended Complaint against

Defendants Exergy and Carkulis alleging six counts: Count I: Breach of Contract

(against Exergy); Count II: Defamation (against Carkulis); Count III: Deceptive

Trade Practices (against Carkulis and Exergy); Count IV: Breach of the Eighth

Loan Agreement (against Exergy); Count V: Breach of Contract—the additional

advances (against Exergy); and Count VI: Unjust Enrichment/Quantum Meruit

(against Exergy).  [Docket No. 22]  By Stipulation [Docket No. 163], the parties

agreed to dismiss Counts IV and V of Plaintiffs' Amended Complaint.  [Docket No. 166]

On September 23, 2014, Defendants filed the present Motion for Summary Judgment on Count I (Breach of Member Control Agreement by Exergy), Count II (Defamation against Carkulis), Count III (Minnesota Deceptive Trade Practices Act against Carkulis and Exergy), and Count VI (Unjust Enrichment/Quantum Meruit) of the Amended Complaint.  [Docket No. 168]

## III.    DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).  To defeat summary judgment, the

nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial."  <u>Wood v. SatCom Mktg., LLC</u>, 705 F.3d 823, 828 (8th Cir. 2013).

In its opposition to Defendants' motion, Plaintiffs move for judgment in their favor pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.  In evaluating Defendants' motion for summary judgment, therefore, the Court also evaluates whether judgment as a matter of law could be rendered in Plaintiffs' favor.

**B.    Count VI – Unjust Enrichment**

In their opposition brief, Plaintiffs agreed to voluntarily dismiss Count VI (Unjust Enrichment) of the Amended Complaint:

> Fagen's unjust enrichment claim related to money Exergy owed Fagen (Counts IV and V).  Those claims have been resolved and dismissed, and Fagen agrees to voluntarily dismiss its unjust enrichment claim at this time.

(Plaintiffs' Mem. Opp. Defs.' Mot. Summ. J., at p. 1 n.1 [Docket No. 173].)

Because the parties are in agreement, the Court will dismiss Count VI of the Amended Complaint.

### C.      Count III – Minnesota Deceptive Trade Practices Act

Count III is a claim under the Minnesota Deceptive Trade Practices Act

(MDTPA), which states in relevant part:

> A person engages in a deceptive trade practice when, in the course
> of business, vocation, or occupation, the person: . . .
>
> (2) causes likelihood of confusion or of misunderstanding as to the
> source, sponsorship, approval, or certification of goods or services;
>
> . . .
>
> (8) disparages the goods, services, or business of another by false or
> misleading representation of fact;
>
> . . . [or]
>
> (13) engages in any other conduct which similarly creates a
> likelihood of confusion or of misunderstanding.

Minn. Stat. § 325D.44, subd. 1.  The "sole statutory remedy for deceptive trade

practices is injunctive relief."  Dennis Simmons, D.D.S., P.A. v. Modern Aero,

Inc., 603 N.W.2d 336, 339 (Minn. Ct. App. 1999) (citation omitted); see also

Damon v.  Groteboer, 937 F. Supp. 2d 1048, 1071 (D. Minn. 2013) ("[I]njunctive

relief is the only remedy under the [MDTPA][.]") (Tunheim, J.).  The statute

"provides relief from future damage, not past damage."  Gardner v. First Am.

Title Ins. Co., 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003) (Kyle, J.) (citation

omitted).

Plaintiffs claim that the alleged statements made by Exergy and Carkulis to NSP "caused a likelihood of confusion or misunderstanding as to the source of the goods provided by the Big Blue Project; to wit, caused confusion as to who was the owner of the Project that would supply electricity to NSP" and "disparaged Fagen by asserting, falsely, that Fagen was not being truthful when it represented to NSP and others that it owned the Big Blue Project." (Am. Compl. ¶¶ 99-100.)   However, Plaintiffs have failed to allege, or submit record evidence of, current conduct to enjoin or future damages.  See Groteboer, 937 F. Supp. 2d at 1071 (granting defendant's motion for summary judgment on MDTPA claim where plaintiff did not present evidence of risk of future harm).

To the extent the Amended Complaint can be construed as a request for injunctive relief preventing Defendants from engaging in the alleged deceptive trade practice (contact with third parties like NSP), this relief has already been granted:

> Defendants stipulate and agree that they will take no action purporting to be on behalf of the Project, that they will not instruct others to do so, and that they will make no communications to any party that they have ownership of, responsibility for, or are acting on behalf of, the Project, except with advance written authorization from Plaintiffs.

(See Order Regarding Motion for Temporary Restraining Order (ECF Docket No.

7) ¶ 5 [Docket No. 16].)  Defendants have agreed to stop the allegedly prohibited

behavior, so further injunctive relief is unnecessary.  See LensCrafters, Inc. v.

Vision World, Inc., 943 F. Supp. 1481, 1497 (D. Minn. 1996) ("It is well-settled . . .

that the need for injunctive relief is obviated when the party accused of using

false or misleading advertising represents that the advertisements will not be

repeated.").

Plaintiffs argue that because they have proven their deceptive trade

practices claim, they are able to recover fees and costs.  Under MDTPA, costs and

attorneys' fees may be awarded to the prevailing party under limited

circumstances.  See Minn. Stat. § 325D.45, subd. 2.  However, "[a] party may not

assert a [MDTPA] claim for the sole purpose of receiving attorney fees."  Dennis

Simmons, 603 N.W.2d at 339.  While the statute authorizes the award of

attorneys' fees to the prevailing party, the "prevailing party" language "appl[ies]

only to a claim for injunctive relief under [MDTPA], not to any claim

demonstrating facts similar to those defined in section 325D.44 as deceptive

practices."  Id.

Therefore, the Court grants the Defendants' motion for summary

judgment on the MDTPA claim and dismisses Count III of the Amended

Complaint.

### D.    Count I – Breach of Member Control Agreement

The Court also grants Defendants' motion for summary judgment as to

Count I of the Amended Complaint.  Plaintiffs argue that Defendants breached

sections 3.4 and 3.5 of the MCA—which allow Fagen to remove Exergy as

Managing Member and appoint new officers—when Carkulis allegedly held

himself out as an officer of Exergy, submitted a monthly progress report, and

misrepresented that Exergy still owned the Big Blue Project.  Defendants argue

that the MCA does not address the actions that Plaintiffs claim to be a breach,

and even if it did, Plaintiffs have failed to produce evidence of damages.  The

Court agrees.

Plaintiffs' claim for breach of the MCA fails as a matter of law because

Plaintiffs have failed to identify a provision in the MCA that prohibits

Defendants' alleged conduct.  Sections 3.4 and 3.5 of the MCA gave Fagen the

right to remove Exergy as Managing Member and Carkulis as officer, but they do

not prohibit Exergy and Carkulis from contacting NSP after they have been

removed.  By the time Defendants made the alleged statements to NSP, they

were no longer parties to the agreement—they had been removed from their

positions as owners and officers of that entity.  Defendants could not breach a

contract that they were no longer bound by.

Moreover, Plaintiffs have not produced evidence of actual damages caused

by the alleged breach, other than the attorneys' fees and costs incurred in

connection with their legal efforts to enjoin Defendants' conduct.  Under

Minnesota law, which governs the MCA, attorney fees are "not recoverable in

litigation unless there is a specific contract permitting or a statute authorizing

such recovery."  Barr/Nelson, Inc. v. Tonto's, Inc., 336 N.W.2d 46, 53 (Minn.

1983).  Because the MCA does not provide for attorneys' fees incurred in

enforcing its terms, they are not recoverable in an action for breach of that

agreement.

Accordingly, the Court grants Defendants' motion for summary judgment

on Plaintiffs' claim for breach of the MCA and dismisses Count I of the Amended

Complaint.

### E.     Count II – Defamation

Count II asserts a claim for defamation under Minnesota law.  To prevail,

Plaintiffs must prove: (a) that the defamatory statement is communicated to

someone other than the plaintiff; (b) that the statement is false; and (c) the

statement tends to harm the plaintiff's reputation and lower the plaintiff in the estimation of the community.  Bahr v. Boise Cascade Corp., 766 N.W.2d 910, 919-20 (Minn. 2009) (citing Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980)).  Defamation that affects the plaintiff's business, trade, profession, office or calling is defamation per se and "thus actionable without any proof of actual damages."  Id. at 920 (quoting Stuempges, 297 N.W.2d at 255).  "If a plaintiff presents sufficient evidence of these three elements, the defendant may nonetheless be entitled to a qualified privilege that defeats the defamation claim if its statement was 'made upon a proper occasion, from a proper motive, and [ ] based upon reasonable or probable cause.'" Chambers v. Travelers Cos., Inc., 668 F.3d 559, 564 (8th Cir. 2012) (quoting Stuempges, 297 N.W.2d at 256-57).  To defeat the qualified privilege, the plaintiff must demonstrate actual malice, in other words, that the defendant "made the statement from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." Id. (quoting Stuempges, 297 N.W.2d at 257).

Plaintiffs base their defamation claim on three alleged statements: (1) Carkulis' statement that he did not know who owned the Big Blue Project; (2) Carkulis' representation that the "underlying transaction remains in place"; and

(3) the Progress Report.  Neither party disputes that the alleged communications were made to a third party, NSP, and thus satisfy the first element of defamation. Defendants dispute the remaining elements and assert a qualified privilege. Because there are fact questions remaining as to the falsity of the alleged defamatory statements and the defense of qualified immunity, the Court denies summary judgment on Count II of the Amended Complaint without reaching the parties' arguments regarding harm to the Plaintiffs' reputation.

### 1. The Falsity of the Alleged Statements

Both parties ask the Court to rule on whether the statements attributed to Carkulis were false as a matter of law.  However, this inquiry is improper on summary judgment, as "the truth or falsity of a statement is inherently within the province of the jury."  Lewis v. Equitable Life Asurance Soc'y, 389 N.W.2d 876, 889 (Minn. 1986).   Therefore, the Court cannot grant summary judgment as to this element of defamation with respect to any of the alleged statements.

There is also a fact dispute as to whether Carkulis made the representation that "the underlying transaction remains in place."  While it is attributed to Carkulis in the letter from NSP, Defendants deny that Carkulis said this to NSP. (See Mem. in Supp. of Exergy and Carkulis's Mot. For Summ. J., at p. 8 ("Mr.

Carkulis disputes making such a statement.") [Docket No. 169].)  The fact finder

must decide which version of events to credit.

In addition to challenging its falsity, Defendants contend that when

Carkulis told NSP that he did "not know" who owned the Big Blue Project, he

was expressing an opinion.  "It is well-recognized in Minnesota that the First

Amendment absolutely protects opinion that lacks 'a provably false statement of

fact.'" McClure v. Am. Family Mut. Ins. Co., 223 F.3d 845, 853 (8th Cir. 2000)

(quoting Hunter v. Hartman, 545 N.W.2d 699, 706 (Minn. Ct. App. 1996)).  Thus,

"[o]nly statements that present or imply the existence of fact that can be proven

true or false are actionable" for defamation.  Thomas v. United Steelworkers

Local 1938, 743 F.3d 1134, 1142 (8th Cir. 2014) (internal citations and quotations

omitted).  "[I]f it is plain that the speaker is expressing a subjective view, an

interpretation, a theory, conjecture, or surmise, rather than claiming to be in

possession of objectively verifiable facts, the statement is not actionable." Id.

(citation and internal quotation marks omitted).  While the falsity of the

statement is a fact question, "[w]hether a communication is actionable because it

contained a provably false statement of fact is a question of law." Chambers, 668

F.3d at 564 (citation omitted).

Contrary to Defendants' assertions, the alleged statement does not express an opinion regarding the ownership of the Big Blue Project.  Nothing in Carkulis' description of the conversation with NSP suggests he was expressing a subjective view, interpretation, conjecture or theory.  The record does not indicate that Carkulis prefaced the statement with "in my opinion" or "my lawyers believe," furthering the impression that it was a statement of fact and not legal opinion.  The ownership of the project, and Carkulis' knowledge thereof, are both verifiable facts that are capable of being proven false for the purposes of a defamation claim.  But whether the communication was false is a question best reserved for the finder of fact.

### 2.   Qualified Privilege

Because it is a potential defense to defamation, the Court also addresses Defendants' arguments regarding qualified privilege.  Qualified privilege under Minnesota law is assessed under a two-step approach:

> First, to establish the existence of the privilege, the defendant bears the burden of proving the communication was: (1) made upon a proper occasion, (2) made from a proper purpose, and (3) based upon reasonable and probable grounds. Whether the [defendant] had a proper purpose and whether the [defendant] had a proper occasion in making a communication are always questions of law for the court to decide.  Whether the [defendant] had reasonable and probable grounds for making the statement is also generally a question of law for the court, unless the evidence permits of more

than one conclusion, when the question becomes one of fact for the jury.

Sherman v. Rinchem Co., Inc., 687 F.3d 996, 1008 (8th Cir. 2012) (quoting Keenan

v. Computer Assocs. Int'l, Inc., 13 F.3d 1266, 1269-70 (8th Cir. 1994)).

Defendants argue that they enjoy a qualified privilege because the alleged

statements were made upon a proper occasion—NSP specifically asked Carkulis

for the information—and with a proper motive—because Carkulis was asked for

and gave his opinion about the status of the project.  Defendants further assert

that the information provided in the Progress Report was based on Exergy's

good-faith belief in the last-known facts of the project and legal advice regarding

ownership of the project.  Plaintiffs insist that because Defendants were acting in

their own pecuniary interest and for their own personal benefit, to leverage

NSP's uncertainty regarding ownership of the Big Blue Project, this is not the

type of scenario where the privilege should apply.  Plaintiffs also contend that

Defendants could not have had probable or reasonable cause in asserting that

Carkulis did not know who owned the wind farm in light of the Purchase

Agreement, and had no reasonable or probable cause to submit the Progress

Report because he was not aware of the current status of the project.

Generally, qualified privileges are recognized because "statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory." Lewis, 389 N.W.2d at 889 (citation omitted). As Plaintiffs argue, Minnesota Courts most commonly apply the privilege in situations where the defamatory statements are of some benefit to the public. See Bol v. Cole, 561 N.W.2d 143, 149-50 (Minn. 1997) (psychologist reporting child abuse); Lewis, 389 N.W.2d at 889 ("In the context of employment recommendations, the law generally recognizes a qualified privilege between former and prospective employers as long as the statements are made in good faith and for a legitimate purpose."). Arguably, it serves no public interest to encourage parties in an ownership dispute to give third-party business partners confusing or conflicting information.

However, the parties have submitted conflicting evidence as to whether Carkulis had reasonable and probable grounds for making the alleged statements. Carkulis testified that the statements were based on his desire for the Big Blue Project to remain viable, his understanding of the law, and the status of the project, at the time they were made. However, he admitted he was aware of the Purchase Agreement, Fagen's asserted ownership interest, and acted in a

28

manner consistent with his understanding that Exergy was no longer in control

of the Big Blue Project.  Moreover, Carkulis admits he "did not know the current

status of the project" when he sent the Progress Report.  (See Carkulis Decl. ¶ 4.)

Because these facts are susceptible to more than one conclusion, the Court must

submit the issue to the fact-finder.

Accordingly, based upon all the files, records, and proceedings herein, **IT**

**IS HEREBY ORDERED:**

1.  Defendants Exergy Development Group of Idaho, L.L.C. and James T. Carkulis's Motion for Summary Judgment [Docket No. 168] is **DENIED** in part and **GRANTED** in part as follows: the motion is granted with respect to Counts I, III, and VI and denied with respect to Count II of the Amended Complaint.

2.  Counts I (Breach of the Member Control Agreement), III (Minnesota Deceptive Trade Practices Act) and VI (Unjust Enrichment) of the Amended Complaint are **DISMISSED WITH PREJUDICE**.


Dated:   February 5, 2015                    s/ Michael J. Davis_____
                                             Michael J. Davis
                                             Chief Judge
                                             United States District Court