## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| FAGEN, INC. and MIDWEST ETHANOL TRANSPORT, LLC, | Civil No.  12-2703 (JRT/SER) |
| Plaintiffs/Counter-Defendants, | |
| v. | |
| EXERGY DEVELOPMENT GROUP OF IDAHO, L.L.C., | |
| Defendant/Counter-Claimant, | |
| JAMES T. CARKULIS, | |
| Defendant. | |

| | |
|---|---|
| FAGEN, INC. and MIDWEST ETHANOL TRANSPORT, LLC, | |
| Third-Party Plaintiffs, | **MEMORANDUM OPINION AND ORDER ON SUMMARY JUDGMENT MOTIONS** |
| v. | |
| HAWLEY TROXELL ENNIS & HAWLEY LLP, | |
| Third-Party Defendant. | |

| | |
|---|---|
| EXERGY DEVELOPMENT GROUP OF IDAHO, L.L.C., and JAMES T. CARKULIS, | |
| Cross-Claimant, | |
| v. | |
| HAWLEY TROXELL ENNIS & HAWLEY LLP, | |
| Cross-Defendant. | |

Bryan R. Battina and James C. MacGillis, **TREPANIER MACGILLIS BATTINA P.A.**, 8000 Flour Exchange Building, 310 Fourth Avenue South, Minneapolis, MN  55415, for Exergy Development Group of Idaho, L.L.C., and James T. Carkulis.

Keith S. Moheban, Timothy M. Kelley, and Katherine A. Moerke, **STINSON LEONARD STREET LLP**, 150 South Fifth Street, Suite 2300, Minneapolis, MN  55402, for Fagen, Inc., and Midwest Ethanol Transport, LLC.

Bryon G. Ascheman and Richard J. Thomas, **BURKE & THOMAS, PLLP**, 3900 Northwoods Drive, Suite 200, Arden Hills, MN  55112, for Hawley Troxell Ennis & Hawley LLP.

Exergy Development Group of Idaho, LLC ("Exergy") sought to develop a wind-powered electrical farm called the Big Blue Project in southern Minnesota and enlisted Fagen, Inc. and its affiliate, Midwest Ethanol Transport, LLC (collectively "Fagen") to build it.  When Exergy struggled to find financing, Fagen stepped in and loaned Exergy approximately $12 million and also took a security interest in the project.  In spite of this loan, however, the Big Blue Project's economic condition reached a crisis point, jeopardizing a $22 million grant from the federal government.  To keep the project on track, Fagen and Exergy entered into a new agreement (called the "Big Blue Transaction"), whereby Exergy conveyed 99 out of 100 membership units in the wind farm to Fagen and in return, Fagen forgave a portion of the Exergy's outstanding debt and agreed to post a letter of credit.  Under the agreement, Exergy also retained the remaining membership and had the option to repurchase Fagen's 99 units if it could obtain financing within a specified time period; if Exergy failed to obtain financing, however, the agreement provided that its remaining unit would automatically transfer to Fagen.  After closing, Exergy attempted to procure financing to exercise the repurchase

option, but failed.   Fagen accordingly invoked the automatic transfer, took control of Exergy's remaining unit, and became 100% owner of the Big Blue Project.

Fagen commenced this action against Exergy shortly thereafter, seeking a declaratory judgment affirming its ownership of the Big Blue Project.   Exergy counterclaimed, alleging that Fagen seized control of the windfarm in violation of Article 9 of the Minnesota Uniform Commercial Code ("UCC"); committed conversion, breach of contract, breach of fiduciary duties, and tortious interference with a prospective business advantage; and was unjustly enriched.   Exergy also brought crossclaims against its former law firm, Hawley Troxell Ennis & Hawley ("Hawley Troxell"), alleging that the firm committed legal malpractice and breached its fiduciary duty while representing Exergy both during and after Big Blue Transaction.   And finally, Fagen brought third-party claims against Hawley Troxell, alleging legal malpractice based on an opinion letter that Hawley Troxell produced for Fagen's benefit, which Fagen alleges it relied upon to its detriment.

The parties have now filed cross motions for summary judgment.   Fagen moves for summary judgment on Exergy's counterclaims.   Exergy moves for summary judgment on some of its counterclaims against Fagen and one of its crossclaims against Hawley Troxell.   And Hawley Troxell moves for summary judgment on all of Exergy's crossclaims and all of Fagen's third-party claims.

The Court will grant summary judgment for Exergy on its UCC counterclaim against Fagen because the transfer of the 1% interest was subject to Article 9.   For this same reason, the Court will also deny Fagen's motion for summary judgment on

Exergy's conversion counterclaim and parts of its breach of contract and breach of fiduciary duty counterclaims.  The Court, however, will grant summary judgment for Fagen on all of Exergy's other counterclaims – there are no genuine issues of material fact.  Additionally, the Court will grant Hawley Troxell's motion for summary judgment on Exergy's legal malpractice and related fiduciary duty crossclaims because Exergy cannot establish but-for causation and has otherwise failed to establish a genuine factual dispute.  But the Court will deny Hawley Troxell's motion on Exergy's breach of the fiduciary duty of loyalty crossclaim, because there is a genuine issue of material fact regarding whether Hawley Troxell put its own interest before Exergy's.  Lastly, the Court will grant Hawley Troxell's motion for summary judgment on Fagen's third-party claims because Fagen cannot establish but-for causation and Hawley Troxell is entitled to immunity.

## BACKGROUND

### I.     PARTIES

Exergy is an Idaho limited liability company, with its principal place of business in Boise, Idaho.  (Decl. of James T. Carkulis ("Carkulis Decl.") ¶ 1, Dec. 15, 2015, Docket No. 403.)  Exergy's sole owner and managing member, James T. Carkulis, is a citizen on the State of Montana.  (*Id.*)  Exergy "is in the business of developing clean-energy power production facilities."  (*Id.*, Ex. W ("MOU") at 2.)

Fagen, Inc. is an industrial building contractor located in Granite Falls, Minnesota, and was founded by Ron Fagen.  (Decl. of Jennifer A. Johnson ("Johnson Decl.") ¶ 2,

Oct. 26, 2012, Docket No. 10.)  Midwest Ethanol Transport, LLC is an affiliate of Fagen, Inc. and is owned by the Fagen family.  (*Id.*)  Both companies specialize in "green energy design" and construction.  (*Id.*)

Hawley Troxell is a law firm and Idaho limited liability partnership, with its principal place of business in Boise, Idaho.  (Answer to Cross-cl. ¶ 3, Aug. 8, 2014, Docket No. 165.)  Hawley Troxell represented Exergy during the Big Blue Transaction and during the beginning of this lawsuit.

## II.    BIG BLUE PROJECT

The Big Blue Project wind farm is located in Blue Earth, Minnesota, near the Iowa border.  (Am. Countercl. ¶ 5, Apr. 24, 2015, Docket No. 260.)  The farm has 18 wind turbines, generates power for approximately 20,000 homes, and sells its electricity to North States Power.  Exergy began developing the Big Blue Project in 2006 and owned the project through several subsidiary companies – Exergy was the sole member of Exergy Minnesota Holdings, LLC ("Exergy Minnesota"), which was the sole member of Minnesota Wind Partners I, LLC, which was the sole member of Big Blue Wind Farm, LLC, which actually owned the Big Blue Project.  (*Id.* ¶¶ 5-6.)

In 2011, Exergy needed funding to officially begin construction on the project, but was unable to obtain financing.  Exergy ultimately turned to Fagen because the parties had a prior business relationship:  Exergy and Fagen teamed up in 2009 to build a different wind farm in Idaho, and pursuant to that project, Fagen had loaned Exergy $6.4 million.  (Decl. of Timothy M. Kelley ("Kelley Decl."), Ex. A ("Fagen Dep.") at

34:6-19, Dec. 15, 2015, Docket No. 396; *id.*, Ex. D at 10:1-3; Decl. of Bryon G. Ascheman ("Ascheman Decl."), Ex. 3 at 12:23-13:4, Dec. 15, 2015, Docket No. 378.) Although Exergy had yet to repay this loan as of 2011, Fagen was nevertheless interested in being the general contractor for the Big Blue Project, and thus agreed to lend Exergy the money it needed.

On September 14, 2011, the parties executed a Master Loan Agreement, Security Agreement, and Pledge Agreement. (Kelley Decl., Ex. E, Ex. K ("Security Agreement"), Ex. L ("Pledge Agreement").) Between that date and February 21, 2012, Fagen made five additional loans to Exergy, as documented in the First, Second, Third, Fourth and Fifth Amended and Restated Loan Agreements. (*Id.*, Exs. F-J.) Altogether, the cumulative loan amount was approximately $12 million. As collateral for these loans, Fagen obtained a security interest in most of Exergy's assets, including all 100 member units of Exergy Minnesota. (*See* Pledge Agreement at 19; Security Agreement ¶ 2.01; Ascheman Decl., Ex. 5 ("Carkulis Dep.") at 92:2-25.) To further memorialize their partnership, the parties executed a Memorandum of Understanding ("MOU") on December 20, 2011. (MOU at 2.) In the MOU, Exergy agreed to use Fagen as its construction contractor for the Big Blue Project and other future wind farm projects, and Fagen agreed to provide Exergy with future loans. (*Id.* at 2-5.)

Despite Fagen's loans, the Big Blue Project began to experience financial difficulties. Exergy lacked capital to finance the project on its own and could not find other investors, which caused Fagen to worry that Exergy would not be able to repay its loans. (*See* Fagen Dep. at 78:1-25.) Fagen also began to worry that the Big Blue Project

would not be completed and operational before December 31, 2012, the deadline for receiving a $22 million grant from the federal government that was crucial to the project's profitability. (*Id.*; Johnson Decl. ¶ 6.)

Matters came to a head on January 31, 2012, when Exergy needed to post a $16.8 million letter of credit to a wind turbine manufacturer. Exergy did not have the financial resources to post the letter and accordingly missed the posting deadline. On February 2, 2012, the manufacturer gave notice to Exergy that it had 30 days, until March 3, 2012, to post the letter of credit; otherwise the manufacturer would delay delivery of the wind turbines or terminate the agreement altogether. Having no "alternative commercial means to secure" the necessary financing, Exergy again turned to Fagen. (Ascheman Decl., Ex. 3 ("Third Carkulis Dep.") at 23:3-24:25.) Fagen agreed to post the letter of credit, but only subject to a specific condition – that the deal would be structured as a sale. Ron Fagen testified in his deposition that he wanted to structure the deal as a sale – and not as another loan coupled with a security interest in Exergy's assets – so that Fagen could take immediate "control" and "ownership" of the Big Blue Project in order to ensure that it would be operational before the December 31 federal grant deadline. (Fagen Dep. at 232:4-16, 283:2-22.) Mr. Fagen testified:

> And we would have to be prepared to move quickly because we had a deadline and we had to have the wind farm – to have any value whatsoever, it had to be spinning and generating power by the end of December, period. That's when the discussion was that it had to be purchased so we didn't dilly dally around with any foreclosure or anything else. We had to be able to move swiftly. And that's why, instead of a loan or whatever, it was we purchased it. We had to. That's why we did it that way.

(*Id.* at 232:6-16.)  Mr. Fagen further testified that he was wary of foreclosure proceedings because many of Exergy's securitized assets "were valued as zero."  (Ascheman Decl., Ex. 22 ("Second Fagen Dep.") at 287:16-18.)

The parties thus entered into the Big Blue Transaction, executing three instruments, effective February 29, 2012: (1) a Sixth Amended and Restated Master Loan Agreement ("Sixth Amended Loan Agreement"); (2) a Limited Liability Company Interest Purchase Agreement ("Purchase Agreement"); and (3) a First Amended and Restated Member Control Agreement of Exergy Minnesota ("MCA").  (Carkulis Decl., Ex. B ("Sixth Amended Loan Agreement"); *id.*, Ex. C ("Purchase Agreement"); *id.*, Ex. D ("MCA").)

The Sixth Amended Loan Agreement obligated Fagen to post a $16.8 million letter of credit to the wind turbine manufacturer.  (*See* Sixth Amended Loan Agreement ¶¶ 9.1-9.3.)  The Purchase Agreement effectuated a conveyance from Exergy to Fagen of 99 of the 100 membership units of Exergy Minnesota, with Exergy retaining the remaining unit.  (Purchase Agreement ¶¶ 2-3.)  In exchange, Fagen agreed to (1) forgive approximately 95% of Exergy's outstanding debt on Fagen's Big Blue Project loans, totaling $11,447,503.02; and (2) post the $16.8 million letter of credit.  (*See id.*)  The Purchase Agreement also included a section acknowledging that Fagen would continue to hold a perfected security interest in the single unit of Exergy Minnesota retained by Exergy as collateral for all of Exergy's outstanding debt obligations, "in accordance with the terms of the [2011] Pledge Agreement."  (*Id.* ¶ 5.)

Lastly, the MCA, which was incorporated by reference into the Purchase Agreement, confirmed that Fagen now owned 99 of the 100 membership units in Exergy Minnesota.  (MCA ¶ 2.2; *see* Purchase Agreement ¶¶ 7(b), 8, 11 (incorporating the MCA by reference into the Purchase Agreement).)   The MCA also included a "Purchase Option," which allowed Exergy to repurchase the 99 units from Fagen if it could obtain "Repayment Capital" on or before June 29, 2012.  (MCA ¶ 2.8.)  "Repayment Capital" is defined within the MCA as "permanent financing that is in an amount sufficient, in Fagen's sole commercially reasonable discretion, to . . . pay in full the Option Purchase Price" of $11,447,503.02 plus accrued interest; to "repay the remaining [5%] balance" plus accrued interest on Fagen's Big Blue Project loans; to "pay all amounts owing . . . to Fagen" under the parties' services agreement; and to "pay any other amounts Fagen has advanced or does advance to Exergy for any reason after the date hereof."  (*Id.*)  To exercise the repurchase option, the MCA provided that "Exergy must deliver the Option Purchase Price to Fagen within two (2) business days of receipt by Exergy of Repayment Capital . . . , but in no event later than June 29, 2012."  (*Id.*)  The MCA further provided that if Exergy failed to timely exercise the repurchase option, (1) the single membership unit "owned by Exergy shall automatically transfer to Fagen, such that Fagen is the owner of one hundred percent (100%) of the Units"; (2) "Exergy shall no longer be a Member and shall have no rights as a Member as of such date"; and (3) "Fagen shall have the right to remove Exergy as the Managing Member of the Company and elect or appoint a new Managing Member."  (*Id.* ¶¶ 2.8, 3.4.1(e).)  And the MCA lastly provided

that "[a]ny officer may be removed as such, either with or without cause, by the Managing Member at any time." (*Id.* ¶ 3.5.10.)

Exergy was represented during the Big Blue Transaction by the law firm Hawley Troxell. Hawley Troxell negotiated the deal on Exergy's behalf and also provided Fagen with an opinion letter at closing. In the opinion letter, the firm rendered the following opinion:

> 2.   All of the membership interest in [Big Blue Wind Farm, LLC] is owned one hundred percent (100%) by [Minnesota Wind Partners I, LLC], which is owned one hundred percent (100%) by [Exergy Minnesota], which is owned one percent (1%) by [Exergy].

(Kelley Decl., Ex. C ("Opinion Letter") at 5.) The opinion letter also included several "limitations, qualifications and exceptions":

> (iii)   Our opinions in Paragraph 2 . . . are based in part on the Managing Member's Certificate that there have been no changes in ownership of any of the Loan Parties since the sale of ninety-nine percent (99%) of the membership interests in [Exergy Minnesota] to [Fagen] effective February 29, 2012.
>
>     . . . .
>
> (v)   Our opinion . . . excludes any opinion as to the enforceability of the Pledge Agreement between [Exergy] and [Fagen] dated September 14, 2011 with respect to the 99% membership interest of [Exergy Minnesota] to [Fagen] conveyed by [Exergy] to [Fagen] pursuant to the [Purchase Agreement] dated as of February 29, 2012.
>
>     . . . .
>
> (ix)   We express no opinion as to the creation, perfection or priority of any security interest.

(*Id.* at 6-7.)

Following the closing of the Big Blue Transaction, Exergy attempted to find financing for the Big Blue Project so that it could exercise the repurchase option.

According to Exergy, it reached advanced discussions with at least two financiers, including D.E. Shaw/BTMU and Edison Mission Electric ("EME"), but it was unable to close a deal. (Carkulis Decl. ¶ 20.) When the June 29, 2012, repurchase option deadline came and went, Fagen extended the deadline because Exergy represented that it was close to a deal with EME. However, when Fagen insisted on a phone call with EME to confirm that a deal was imminent, it learned that EME was no longer interested in financing the project. (Fagen Dep. at 126:6-10; Kelley Decl., Ex. R ("Second Carkulis Dep.") at 182:10-18, 189:1-25, 190:1-11.) Accordingly, on August 29, 2012, Fagen notified Exergy by letter that it was invoking the automatic transfer of the Exergy's single membership unit in Exergy Minnesota; removing Exergy's principals from their officer roles at Exergy Minnesota; terminating Exergy's membership rights in Exergy Minnesota; and taking control of the Big Blue Project by virtue of its 100% ownership of Exergy Minnesota. (Ascheman Decl., Ex. 44.) Over the next four months, Fagen invested approximately $60 million into the Big Blue Project and completed the wind farm in time to qualify for the federal grant deadline. (Kelley Decl., Ex. U at 96:13-97:1.)

## III. PROCEDURAL HISTORY

Fagen commenced this action against Exergy in the fall of 2012, seeking a declaratory judgment that it owned 100% of the Big Blue Project. In response, Exergy counterclaimed for violations of Article 9 of the Minnesota Uniform Commercial Code ("UCC"), conversion, breach of contract, breach of fiduciary duty and other duties,

intentional interference with a prospective business advantage, unjust enrichment, and a declaratory judgment regarding the applicability of Article 9 to the Big Blue Transaction and Fagen's fiduciary duties.   Exergy also brought crossclaims against Hawley Troxell for legal malpractice, breach of contract, and breach of the fiduciary duty of loyalty based on Hawley Troxell's representation during and after the Big Blue Transaction.   Finally, Fagen brought third-party claims against Hawley Troxell, alleging legal malpractice based on the opinion letter that Hawley Troxell drafted for Fagen's benefit.

All parties have now filed motions for summary judgment.   Fagen moves for summary judgment on all of Exergy's counterclaims, while Exergy moves for summary judgment on its UCC, breach of fiduciary duty, intentional interference with a prospective economic advantage, unjust enrichment, and declaratory judgment counterclaims.   Exergy also moves for summary judgment on one of its crossclaims against Hawley Troxell.   And Hawley Troxell moves for summary judgment on all of Exergy's crossclaims and all of Fagen's third-party claims.

## ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.   EXERGY'S COUNTERCLAIMS AGAINST FAGEN

### A.   Uniform Commercial Code

In its first counterclaim, Exergy alleges that Fagen violated Article 9 of the UCC by unilaterally assuming control of Exergy's one membership unit in Exergy Minnesota on August 29, 2012. Exergy contends that Fagen held only a security interest in the unit, and Fagen therefore was required to comply with Article 9's post-default dispositional requirements, which it did not.[1] Fagen, on the other hand, argues that Article 9 did not

---

[1] In its amended counterclaim, Exergy initially alleged that Fagen also violated Article 9 by assuming control of the 99 memberships units of Exergy Minnesota without complying with Article 9's post-default dispositional requirements. (*See* Am. Countercl. ¶¶ 28-34.) During briefing for the present summary judgment motions, however, Exergy conceded that "Article 9

(Footnote continued on next page.)

apply to the transfer of the single unit, meaning it had no obligation to comply with Article 9's post-default dispositional requirements. Both parties have moved for summary judgment on this claim.

Under Minnesota law, a security interest is "an interest in personal property . . . which secures payment or performance of an obligation." Minn. Stat. § 336.1-201(b)(35). A security interest is enforceable if (1) "value has been given"; (2) "the debtor has rights in the collateral"; and (3) "the debtor has authenticated a security agreement that provides a description of the collateral." *Id.* § 336.9-203(b). In evaluating whether an enforceable security interest was created, the Court looks to the intent of the parties. *Vacura v. Haar's Equip., Inc.*, 364 N.W.2d 387, 392 (Minn. 1985). The relevant inquiry, however, is whether the parties objectively intended to create a security interest, rather than the parties' "subjective intent." *Id.* If a valid security interest is created and the debtor defaults on the underlying obligation, Minnesota law requires the secured party to dispose of the collateral in a "commercially reasonable" manner, which generally means conducting a foreclosure sale. Minn. Stat. § 336.9-610(b)-(c).

---

(Footnote continued.)

of the Minnesota UCC . . . does not apply to the initial transfer of the 99 Units of [Exergy Minnesota]." (Exergy's Mem. in Opp'n to Fagen's Mot. for Summ. J. at 2, Jan. 5, 2016, Docket No. 418.) This was a wise decision, as the Court finds that the 99-unit transfer was not subject to Article 9. *See In re NTA, LLC*, 380 F.3d 523, 531-32 (1st Cir. 2004). Exergy has additionally clarified that it is only alleging that Fagen violated Article 9 with respect to the transfer of the single unit. (*Id.*) Thus, the only issues now before the Court are whether Article 9 applied to the August 29 transfer of the single membership unit and, if so, whether Fagen violated Article 9's post-default dispositional requirements.

Here, Fagen contends that the transfer of the single unit was not subject to Article 9's post-default dispositional requirements because the transfer itself did not fall within the scope of Article 9 and was instead a part of the broader Big Blue Transaction – the outright sale of the wind farm.  According to Fagen, as a result of the Big Blue Transaction – as set forth in the Purchase Agreement, MCA, and Sixth Amended Loan Agreement – Exergy agreed to (1) immediately convey 99 membership units in Exergy Minnesota to Fagen and (2) convey its remaining membership unit to Fagen at a later date if Exergy failed to obtain financing necessary to, among other things, repurchase the 99 units.  In return, Fagen agreed to (1) forgive approximately 95% of Exergy's outstanding loan obligations, (2) post a $16.8 million letter of credit for Exergy, and (3) give Exergy the option to repurchase the 99 units if it timely obtained the above-described financing.  Fagen asserts that the objective intent of this arrangement was to effectuate an outright sale of the wind farm, and the mere fact that the sale had a contingency – the transfer of the remaining membership unit if Exergy did not exercise the repurchase option – does not show that the parties objectively intended for that contingency to operate as a security interest.

The Court is not persuaded.  Most significantly, Fagen overlooks the fact that the parties expressly agreed in Paragraph 5 of the Purchase Agreement that Fagen would **continue** to hold a perfected security interest in the single unit of Exergy Minnesota,[2] as

---

[2] Prior to the Big Blue Transaction, Fagen held a perfected security interest in all 100 membership units in Exergy Minnesota.  (*See* Pledge Agreement at 19.)

security for the remaining loans that Fagen did not forgive as a part of the Big Blue Transaction (amounting to approximately 5% of the pre-Big Blue Transaction loan balance).[3] (*See* Purchase Agreement ¶ 5.)   Under this continued security interest, Exergy had until July 29, 2012, to repay its remaining loan balance, and Fagen's security interest in the single unit operated to secure Exergy's performance of that obligation. (*Id.* ¶¶ 4-5; *see* Sixth Amended Loan Agreement, arts. 2, 4-9; Pledge Agreement.)

While Fagen tries to frame the repurchase option and contingent automatic transfer as being separate from the above-described continued security interest, the Court finds that they are not separate.  To exercise the repurchase option, Exergy was required to obtain Repayment Capital, which included, among other things, "an amount sufficient . . . to . . . **repay the remaining balance of principal of and accrued interest under the Loans.**"  (MCA ¶ 2.8 (emphasis added).)   And Exergy was required to come up with this Repayment Capital before July 29, 2012, otherwise its single membership unit in Exergy Minnesota would automatically transfer to Fagen. *Id.*  Thus, under both the continued security interest and the repurchase option, the single membership unit in Exergy Minnesota securitized the exact same obligation (Exergy's repayment of its remaining loan balance to Fagen) on the exact same timeline (before July 29, 2012). Indeed, Exergy could not have defaulted on its remaining loans to Fagen and still

---

[3] Paragraph 5 of the Purchase Agreement provides that Exergy will "continue to own one (1) unit of the member interests [in Exergy Minnesota] . . . and the remaining outstanding Obligations under the Loan Agreement shall continue to be secured by a perfected security interest in favor of Fagen in the member interests owned by Exergy, in accordance with the terms of the Pledge Agreement."  (Purchase Agreement ¶ 5.)

exercise the repurchase option and avoided the automatic transfer.  Accordingly, the Court finds that the parties objectively intended for Fagen to hold a security interest in the single membership unit, governed by Article 9.  Fagen gave Exergy value in the form of loans; Exergy retained ownership of the single unit, with that single unit acting as security to secure Exergy's repayment of those loans; and the Purchase, Pledge, and Sixth Amended Loan Agreements and the MCA collectively constituted a security agreement, which Exergy authenticated.

The Court also finds that when Exergy failed to exercise the repurchase option, Fagen was required to comply with Article 9's post-dispositional requirements and could not rely on the automatic-transfer provision within the repurchase option as grounds to unilaterally assume control of the unit.  Minnesota law prohibits a secured party from retaining collateral "in full or partial satisfaction of the obligation it secures" unless the debtor consents to the acceptance **after** the default.  Minn. State. § 336.9-620(a), (c). Here, the parties agreed to the automatic-transfer provision **before** Exergy defaulted on its remaining loan obligations.  The automatic transfer provision was accordingly invalid and unenforceable, and Fagen did not dispose of the collateral in a "commercially reasonable" manner.  Minn. Stat. § 336.9-610(b)-(c).

Fagen raises several counterarguments, but they are all unavailing.  First, Fagen contends that Article 9 cannot apply to the repurchase option and contingent automatic transfer because the single membership unit in Exergy Minnesota was a "certificated security" within the meaning of UCC Article 8.  But this argument fails – even if the membership unit was a certificated security, this does not mean that it could not serve as

collateral for an Article 9 secured transaction.  Article 9 applies to any "transaction, regardless of its form, that creates a security interest in personal property."  Minn. Stat. § 336.9-109(a)(1).  And a certificated security constitutes personal property.  *See* Minn. Stat. § 336.8-302, UCC cmt. 2 ("Under the Article 9 rules, a security interest in a certificated or uncertificated security can be created by execution of a security agreement under Section 9-203.").  Thus, whether the membership unit was a certificated security within the meaning of Article 8 has no bearing here on the applicability of Article 9.

Second, Fagen argues that even if Article 9 did apply to the transfer, Exergy agreed to a strict foreclosure.  Under Minn. Stat. § 336.9-620(c), a secured party may accept the collateral in partial or full "satisfaction of the obligation it secures" if the debtor "consents" to such an acceptance and "agrees to the terms of the acceptance in a record authenticated after default."  Minn. Stat. § 336.9-620(c)(1)-(2).  Here, Fagen argues that the MCA and Repurchase Option constituted a strict foreclosure because (1) Exergy allegedly defaulted on the Fifth Amended Loan Agreement by failing to disclose to Fagen that it had encumbered the Big Blue Project with a $7.6 million promissory note; (2) this alleged default occurred before the parties executed the MCA and repurchase option; (3) Exergy consented to transferring the one unit to Fagen in satisfaction of the debt secured under the Fifth Amended Loan Agreement; and (4) the MCA constitutes an authenticated record of Exergy's consent, which was executed after the default.  But this argument cannot succeed.  Minn. Stat. § 336.9-620(c) requires the debtor to "consent" to a strict foreclosure, and here, there is absolutely no evidence that Exergy ever gave such consent.   When the parties executed the MCA, they did so as a

part of the larger Big Blue Transaction.   The driving force behind the Big Blue Transaction was Exergy's need to post a $16.8 million letter of credit, not to effectuate a strict foreclosure.   Indeed, Fagen has not offered any evidence showing that the parties contemplated or even discussed Exergy's purported default under the Fifth Amended Loan Agreement prior to executing the MCA.   Accordingly, it can hardly be said that Exergy consented to Fagen accepting the member unit in satisfaction under § 336.9-620(c).  The Court therefore finds that strict foreclosure does not apply here.

Lastly, Fagen argues that even if Article 9 did apply to the transfer, and even if it did fail to dispose of the membership unit in a commercially reasonable manner, Exergy's claim nevertheless fails because it has not offered admissible evidence of damages.   Pursuant to Minn. Stat. § 336.9-625(b), "a person is liable for damages in the amount of any loss caused by a failure to comply with [Article 9]."   Here, Exergy's damages expert, Robert Reilly, withdrew from the case, and this Court denied Exergy's motion to substitute a new expert.   Without an expert on damages, Fagen contends that Exergy's Article 9 claim cannot survive summary judgment.   Though it may very well be that Exergy will be unable to produce admissible evidence of its damages at trial, the Court is unwilling to make this finding at the present time.   Exergy contends that it has another expert who can opine on its Article 9 damages – James Carkulis.  And Fagen has not argued that Carkulis' opinions on this topic should be excluded.   The Court will accordingly wait to resolve this issue until a later date.

Based on the above, the Court finds that Fagen held a security interest in the single membership unit of Exergy Minnesota, and Fagen was therefore required to comply with

Article 9's post-default dispositional requirements, which it did not.  The Court will thus grant summary judgment for Exergy on the issue of Article 9 liability, and deny Fagen's motion to the same extent.  The Court, however, will deny both parties' motions with respect to the issue of damages.

### B.    Conversion

In its second counterclaim, Exergy alleges that Fagen committed conversion by wrongfully depriving Exergy of its ownership interest in the single membership unit of Exergy Minnesota, based on Fagen's failure to adhere to Article 9's post-default dispositional requirements.  Only Fagen has moved for summary judgment on this claim.

"Conversion exists when a defendant has wrongfully exercised dominion over a plaintiff's personalty that is without justification or that is inconsistent with the rights of the person entitled to use, possession, or ownership of the property."  *In re MJK Clearing, Inc.*, 286 B.R. 862, 879 (Bankr. D. Minn. 2002) (citing *Fawcett v. Heimbach,* 591 N.W.2d 516, 519–520 (Minn. Ct. App. 1999)); *see Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948) ("Conversion has been defined as an act of wilful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession.")  Here, because Fagen assumed ownership of the single membership unit in violation of Article 9's mandatory dispositional requirements, it can be said that Fagen committed conversion by wrongly exercising dominion over Exergy's personal property without justification and in a manner that was inconsistent with Exergy's rights.  *See Bloomquist v. First Nat'l Bank of*

*Elk River*, 378 N.W.2d 81, 86 (Minn. Ct. App. 1985) (finding that a secured party's wrongful repossession of collateral from a debtor constituted conversion).  The Court will accordingly deny Fagen's motion for summary judgment on this claim.

### C.      Breach of Contract

In its third counterclaim, Exergy alleges that Fagen breached the MCA and other Exergy Minnesota corporate governance documents by (1) asserting ownership over Exergy's remaining membership unit in Exergy Minnesota, (2) removing Exergy as managing member, and (3) removing Carkulis and other Exergy executives from their officer positions, all without giving the proper notice or obtaining Exergy's signature, as required under Minn. Stat. § 322B.35, subdivision 1.   Only Fagen has moved for summary judgment on this claim, and the Court will grant the motion in part and deny it in part.

First, to the extent Exergy argues that Fagen breached the MCA by removing Exergy as managing member and removing Carkulis and other Exergy executives from their officer positions, those claims cannot survive summary judgment because the MCA explicitly authorized Fagen to take those actions.  Under the MCA, Fagen had the right to remove Exergy as managing member of Exergy Minnesota if it failed to exercise the repurchase option, and the managing member also had the right to remove "[a]ny officer . . . with or without cause . . . at any time."  (MCA ¶¶ 2.8, 3.4.1, 3.5.10.)  Fagen did not breach the MCA simply by enforcing its terms.  *See* Minn. Stat. § 322B.37, subdiv. 3(a) ("A member control agreement . . . is enforceable by persons who are parties to it . . . .").

Fagen also did not violate Minn. Stat. § 322B.35, subdivision 1.  Section 322B.35, subdivision 1 allows LLC members to act "by written action," as long as the written action is signed "by all of the members."  Here, the MCA itself was a written action, it authorized Fagen to remove Exergy as managing member and Exergy's principals from their officer roles, and Exergy signed it.  *See id.* § 322B.37, subds. 1, 3.  The Court will therefore grant summary judgment for Fagen on this part of Exergy's claim.

The Court, however, will deny the motion with respect to Exergy's claim that Fagen breached the MCA by unilaterally asserting ownership over the single membership unit.  As discussed earlier in this Order, the automatic transfer provision within the MCA was invalid and unenforceable because it circumvented Article 9's post-dispositional requirements.  Because Fagen could not rely on this contractual provision to justify the transfer, and the MCA did not otherwise allow Fagen to usurp Exergy's membership unit, the Court will deny this aspect of Fagen's motion.

### D.      Breach of Fiduciary Duties and Other Duties

In its fourth counterclaim, Exergy alleges that Fagen breached various fiduciary and contractual duties arising out of the parties' relationship as co-members of Exergy Minnesota, the MCA, and other corporate governance documents, including the duties of care, loyalty, good faith, and fair dealing.  Exergy contends that Fagen breached these duties by assuming ownership of Exergy's remaining membership unit in Exergy Minnesota, removing Exergy as managing member, and removing Carkulis and other Exergy executives from their officer positions, which in turn prevented Exergy from

obtaining financing and otherwise recapturing control of the Big Blue Project.  Both parties have moved for summary judgment; the Court will grant Fagen's motion in part and will deny Exergy's motion.

As with the breach of contract claim above, the Court finds that Exergy's claims relating to its removal as managing member and the removal of Carkulis and others from their officer positions cannot survive summary judgment.  Fagen had explicit authorization under the MCA to take those actions, (*see* MCA ¶¶ 2.8, 3.41, 3.5.10), and Exergy cannot establish that Fagen breached a duty of care, loyalty, good faith, or fair dealing merely because it enforced the MCA.  *See Residential Funding Co., LLC v. Terrace Mortgage Co.*, 725 F.3d 910, 918 (8th Cir. 2013) ("A party to a contract 'does not act in bad faith by asserting or enforcing its legal and contractual rights.'"); *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998) (finding that a party did not violate the duties of good faith and fair dealing merely "by asserting or enforcing its legal and contractual rights").  The Court will thus grant summary judgment for Fagen on this aspect of Exergy's claim.

However, the Court will deny both parties' motions with respect to Exergy's claim that Fagen breached these duties by taking control of Exergy's single membership unit in Exergy Minnesota.  To succeed on a claim for breach of the fiduciary duties of care and/or loyalty, a plaintiff must show that the defendant failed to act "openly, honestly, and fairly." *Evans v. Blesi*, 345 N.W.2d 775, 779 (Minn. Ct. App. 1984); *see* Minn. Stat. § 322B.833, subd. 4.   And to succeed on a claim for a breach of the implied covenant of good faith and fair dealing, a plaintiff must show that the defendant "unjustifiably

hinder[ed]" the plaintiff's performance of the contract and acted in bad faith. *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (quoting *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984)); *see also Sterling Capital Advisors*, 575 N.W.2d at 125. Here, the Court finds that there is a genuine factual dispute regarding whether Fagen breached any of these duties by invoking the automatic transfer. A reasonable jury could find that Fagen acted unfairly or in bad faith by violating Article 9. Summary judgment is accordingly inappropriate for this aspect of Exergy's claim.

As a final matter, the Court notes that Exergy, in its briefing, raises an entirely new allegation: Fagen breached duties arising out of the parties' 2011 MOU agreement. Exergy, however, did not plead this claim in its amended counterclaim, as the MOU is mentioned only one time, in a section discussing the parties' prior business relationship, and the cause of action itself neither directly nor indirectly references the MOU. (*See* Am. Countercl. ¶¶ 6, 43-50.) Because Exergy did not plead this claim, the Court would ordinarily decline to consider it without further analysis. *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) (holding that a plaintiff may not "manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment"); *Taha v. Engstrand*, 987 F.2d 505, 507 (8th Cir. 1993) (finding that the district court "was justified in ignoring" claims that "were not made in the complaint").

Exergy, however, argues that the claim should not be summarily dismissed because it has been tried by the consent of the parties in accordance with Federal Rule of

Civil Procedure 15(b)(2).  Under that rule, "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."  Fed. R. Civ. P. 15(b)(2).  "Implied consent exists where a party has 'actual notice of an unpleaded issue and ha[s] been given an adequate opportunity to cure any surprise resulting from the change in the pleadings.'"  *Am. Family Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 348 (8th Cir. 2013) (quoting *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1997)).

Applying Rule 15(b)(2), Exergy argues that Fagen had actual notice of and thus impliedly consented to a breach of fiduciary duty claim based on the 2011 MOU because it was "amply discussed during discovery."  (Exergy's Reply Mem. at 12, Jan. 19, 2016, Docket No. 427.)  Exergy argues that the claim came up during the depositions of Ron Fagen and Fagen executive Jennifer Johnson, that it disclosed the claim in its expert witness disclosure, and that Fagen's own counsel "elicited" "extensive testimony" about the MOU during James Carkulis's expert witness deposition.  (*Id.* at 12-13.)  But the Court is not convinced.

First, while the MOU did come up during the depositions of Ron Fagen and Johnson, there is no indication that the MOU's mention gave Fagen "actual notice" of Exergy's intent to pursue a specific breach of fiduciary duty claim based on it.  Indeed, Exergy's counsel during Ron Fagen's deposition explained that he was inquiring about the MOU because he was "trying to understand what kind of deal" the parties put together.  (Decl. of Angelo L. Rosa ("Rosa Decl."), Ex. F at 48:18-22, Dec. 15, 2015, Docket No. 404.)  Such an explanation, and the subsequent questioning, does not

constitute actual notice of an unpleaded breach of fiduciary duty claim, nor does it establish that Fagen impliedly consented to the addition of this new claim.

Second, contrary to Exergy's assertion, its expert witness disclosure did not apprise Fagen of a new MOU-related claim. Exergy merely disclosed that Carkulis would give an expert opinion about "Fagen's deviation from industry standards in its capacity as a fiduciary of Exergy given the unique relationship between Fagen and Exergy as established by the evidence in this matter." (Exergy's Disclosure of Expert Witnesses at 4, May 15, 2015, Docket No. 277.) Nothing about that vague disclosure constitutes actual notice of the claim that Exergy now seeks to add.

Finally, the record does not bear out Exergy's contention that Fagen's counsel "elicited" "extensive testimony" about the MOU during Carkulis's expert witness deposition. During his deposition, Fagen's counsel asked Carkulis an open ended question: "One of the claims in this case is a claim of breach of fiduciary duty. Do you have any opinions that you intend to give at trial regarding a breach of fiduciary claim?" (Rosa Decl., Ex. J at 87:23-88:2.) In response, Carkulis gave a detailed answer that included opinions about breaches of fiduciary duties stemming from the MOU; it was only after that answer that Fagen's counsel asked additional follow-up questions implicating the MOU. (*See, e.g.*, *id.* at 88:3-89:14, 101:19-104:18.) This does not constitute eliciting extensive testimony. And even if Carkulis' testimony did give Fagen "actual notice" of Exergy's intent to pursue an unpleaded fiduciary duty claim, that notice came so late – five days before the close of expert discovery – that it cannot be said that Fagen had an adequate opportunity to cure any surprise resulting from the change in the

pleadings.  (*Id.* at 2 (noting that the deposition was taken on November 11, 2015); Third

Am. Pretrial Scheduling Order at 2, July 9, 2015, Docket No. 325 (setting November 16,

2015, as the deadline for all "expert discovery including expert depositions").)

Simply put, Exergy has not shown that Fagen impliedly consented to the addition

of a breach of fiduciary duty claim based on the MOU.   Accordingly, the Court will

decline to consider this new claim.  *N. States Power Co.*, 358 F.3d at 1057; *Taha*, 987

F.2d at 507.

### E.     Tortious Interference with a Prospective Economic Advantage

In its fifth counterclaim, Exergy alleges that Fagen tortuously interfered with its

efforts to obtain permanent financing for the Big Blue Project.  Both parties have moved

for summary judgment.

To succeed on a claim for tortious interference with a prospective economic

advantage, a plaintiff must show:

> 1) The existence of a reasonable expectation of economic advantage;
>
> 2) Defendant's knowledge of that expectation of economic advantage;
>
> 3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;
>
> 4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and
>
> 5) That plaintiff sustained damages.

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.,* 844 N.W.2d 210, 219

(Minn. 2014).  Exergy contends that Fagen is liable for tortious interference because it

knew that Exergy was on the verge of closing a deal with two financiers – EME and D.E. Shaw/BTMU – but then wrongfully prevented either deal from closing.  Fagen, on the other hand, argues that Exergy's claim necessarily fails because Exergy has not shown that it had a reasonable expectation of economic advantage with EME that Fagen knew about or that Fagen's alleged interference with the D.E. Shaw/BTMU deal was independently tortious or in violation of a state or federal statute or regulation.  The Court concurs with Fagen's assessments.

First, no reasonable jury could find that Exergy had a reasonable expectation of economic advantage with EME.  To establish this element, a plaintiff must offer evidence showing "a reasonable probability of a future economic relationship," as opposed to a "mere hope or wish."  *Gieseke*, 844 N.W.2d at 221, 222 n.11 (quoting *J.A. Morrissey, Inc. v. Smejkal*, 6 A.3d 701, 709 (Vt. 2010)).  Here, Exergy has offered no evidence showing a reasonable probability of a future economic relationship with EME.  Instead, the evidence demonstrates that Exergy was never close to a deal with EME, (Second Carkulis Dep. at 182:10-18); EME offered a purchase price that, in Exergy's view, would have resulted in "probably no profit" for Exergy, (*id.* at 190:8-11); and EME eventually backed out of the deal because its "parent company had financial difficulties," (Fagen Dep. at 126:6-10).  Moreover, even if Exergy could show that it had a reasonable expectation of a deal with EME, it has not offered evidence sufficient to show that Fagen had any knowledge of this expectation.  Exergy asserts that Fagen wrongfully prevented the consummation of a deal by taking 100% ownership of the Big Blue Project on August 29, 2012.  But Fagen has presented undisputed evidence that EME informed

representatives from both Fagen and Exergy, in a phone call occurring just prior to August 29, that it "no longer could pursue the project" because of its parent company's "financial difficulties." (*Id.*) Based on this phone call, Fagen had grounds to assume that the deal between EME and Exergy was dead, and Exergy has not offered any evidence suggesting that it revived its negotiations with EME or that Fagen would have known about revived talks. Exergy's tortious interference claim with respect to EME accordingly fails as a matter of law.

Second, no reasonable jury could find that Fagen's alleged interference with the D.E. Shaw/BTMU deal was independently tortious or in violation of a state or federal statute or regulation. Exergy argues that Fagen interfered with the deal "by refusing to release [its security interest in] the membership units [of Exergy Minnesota] and demanding full repayment of its debt before consenting to the D.E. Shaw/BTMU transaction." (Am. Countercl. ¶ 53.) But Fagen's conduct as alleged was neither tortious nor unlawful. In order to exercise the repurchase option and reclaim ownership of the Big Blue Project, Exergy needed to obtain permanent financing in an amount sufficient to pay, among other things, the full purchase price for Fagen's 99 membership units in Exergy Minnesota as well as the remaining balance on its outstanding loans to Fagen. D.E. Shaw/BTMU's best offer, meanwhile, was too low to cover those amounts. Fagen had every right to enforce its agreement with Exergy and decline to consent to the D.E. Shaw/BTMU deal, and it did not commit a tort or violate the law by doing so. Exergy's tortious interference claim with respect to D.E. Shaw/BTMU accordingly also fails as a matter of law.

As a final matter, the Court notes that in both moving for summary judgment and opposing Fagen's motion, Exergy again raises entirely new and unpleaded claims: that Fagen tortiously interfered with Exergy's reasonable expectation of (1) developing future wind farm projects under the parties' MOU and (2) deriving revenue from an Idaho wind farm project.  The Court will decline to consider these claims, however, because they were not pleaded in the complaint, and there is no indication that they were tried by the consent of the parties.  *N. States Power Co.*, 358 F.3d at 1057; *Taha*, 987 F.2d at 507.

Based on the above, the Court will grant Fagen's motion for summary judgment and deny Exergy's motion.  Viewing the evidence in the light most favorable to Exergy, the Court finds that Exergy has failed to make a submissible case for tortious interference with a prospective economic advantage.

## F.    Unjust Enrichment

In its sixth counterclaim, Exergy alleges that Fagen unjustly enriched itself by refusing to reimburse Exergy for approximately $18.9 million in costs it incurred developing the Big Blue Project.  Both parties have moved for summary judgment – Exergy on the issue of liability and Fagen on the entire claim.  For the reasons that follow, the Court will grant Fagen's motion and deny Exergy's.

"To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant 'in equity and good conscience' should pay." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (quoting *Klass v. Twin City*

*Fed. Sav. & Loan Ass'n*, 190 N.W.2d 493, 494-95 (Minn. 1971)).  According to Exergy, it expended approximately $18.9 million in developing the Big Blue Project; it incurred these expenses as a vendor for the project; and Fagen, since taking ownership, has refused to reimburse Exergy, even though it has reimbursed other vendors.  Exergy contends that but for its monetary contributions, the Big Blue Project would not be operational, and it would be unjust for Fagen to retain this benefit.

Fagen, by contrast, argues that Exergy's claim, regardless of its merit, necessarily fails because Exergy sued the wrong the party and it has not offered evidence sufficient to justify piercing the corporate veil.  The Court agrees.  To the extent Exergy conferred a benefit by expending $18.9 million, the Court finds that it conferred this benefit on the entity that actually owns the Big Blue Project, Big Blue Windfarm, LLC.  And while Big Blue Windfarm, LLC is a subsidiary of Fagen, Minnesota law expressly provides that "a member . . . of a limited liability company is not, merely on account of this status, personally liable for the acts, debts, liabilities, or obligations of the limited liability company."  Minn. Stat. § 322B.303, subd. 1.  Although this liability veil is not absolute, Exergy may only pierce it by establishing that (1) Fagen and Big Blue Windfarm, LLC failed to maintain a sufficiently separate identities (i.e., Big Blue Windfarm, LLC is an alter ego or mere instrumentality of Fagen), and (2) piercing the veil is necessary to avoid fundamental unfairness, fraud, or injustice.  *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979); *see* Minn. Stat. § 322B.303, subd. 2 (stating that case law governing veil-piercing "also applies to limited liability companies").

Here, Exergy has failed to offer evidence sufficient to establish either element. Exergy's only argument in favor of veil-piercing is that Fagen "freely funded the completion of the Big Blue Project." (Exergy's Mem. in Opp'n to Fagen's Mot. for Summ. J. at 17, Jan. 5, 2016, Docket No. 418.) But this assertion, even if true, does not show that the Big Blue Windfarm, LCC was an alter ego or mere instrumentality of Fagen. And most significantly, Exergy conceded during the hearing that it should have named Big Blue Windfarm, LLC as a party to this action. Exergy certainly cannot show that piercing the veil is necessary to avoid fundamental unfairness, fraud, or injustice if it could have but declined to bring its claim against the entity that actually owns the Big Blue Project.

Accordingly, the Court will grant Fagen's motion for summary judgment on Exergy's unjust-enrichment counterclaim and deny Exergy's motion – Exergy has failed to offer evidence sufficient to justify piercing the corporate veil.

### G.    Declaratory Judgment

In its seventh and final counterclaim, Exergy seeks a declaratory judgment that the transfer of the single membership unit in Exergy Minnesota was governed by Article 9, and that Fagen owed Exergy certain fiduciary duties. Both parties have moved for summary judgment, but the Court will grant Fagen's motion because this counterclaim is entirely duplicative of Exergy's first and fourth counterclaims. In context of Exergy's first counterclaim, the Court has already determined that transfer of the single membership unit was governed by Article 9. And in the context of Exergy's fourth

counterclaim, the Court has already determined that there are genuine factual disputes regarding whether Fagen breached fiduciary duties that it owed to Exergy. The Court will therefore summarily dismiss this duplicative counterclaim.

## III.   EXERGY'S CROSSCLAIM AGAINST HAWLEY TROXELL

Exergy brings multiple crossclaims against Hawley Troxell, alleging that the firm committed legal malpractice based on professional negligence and breach of contract and that the firm breached its fiduciary duty of loyalty to Exergy. Exergy has moved for summary judgment only on its professional negligence crossclaims, while Hawley Troxell has moved for summary judgment on all of Exergy's crossclaims. The Court has grouped Exergy's crossclaims into three categories..

### A.   Article 9 and Opinion Letter Crossclaims

Exergy first alleges that Hawley Troxell committed legal malpractice based on professional negligence and breach of contract – and that the firm breached its fiduciary duty of loyalty to Exergy – by falsely advising Exergy that the 99-unit transfer would be subject to Article 9, by failing to fully inform Exergy of the risks and consequences if Article 9 did not apply, and by contradicting its advice regarding the applicability of Article 9 in the opinion letter it produced for Fagen's benefit and on subsequent occasions. Exergy further contends that because of Hawley Troxell's deficient representation, it has been forced to litigate the present lawsuit against Fagen. For the reasons that follow, the Court will grant summary judgment for Hawley Troxell on each of these crossclaims.

### 1.    Professional Negligence and Breach of Contract

To succeed on a claim "for legal malpractice arising out of representation in a transactional matter" based on professional negligence or breach of contract,

> the plaintiff must prove four elements: (1) an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts proximately caused the plaintiff's damages; and (4) that but for the defendant's conduct, the plaintiff would have obtained a more favorable result in the underlying transaction than the result obtained.

*Schmitz v. Rinke, Noonan, Smoley, Deter, Colombo, Wiant, Von Korff & Hobbs, Ltd.*, 783 N.W.2d 733, 738-39 (Minn. Ct. App. 2010) (citing *Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816 (Minn. 2006)). "If the plaintiff does not provide sufficient evidence to meet all of these elements, the claim fails." *Larkin*, 711 N.W.2d at 816.

Hawley Troxell argues that Exergy's legal malpractice crossclaims relating to Article 9 and the opinion letter must be summarily dismissed because Exergy has not offered sufficient evidence of but-for causation. The Court agrees. In evaluating but-for causation in the transactional setting, the Court "must envision what would have occurred but for the negligent conduct." *Schmitz*, 783 N.W.2d at 741 (quoting *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 812 (Minn. Ct. App. 2007)). A plaintiff cannot prevail simply by "[s]howing that 'many positive things **could** have occurred' but for the [at-issue] conduct." *Id.* (quoting *Christians*, 733 N.W.2d at 813). "[I]nstead, the plaintiff must 'introduce concrete evidence of what [the plaintiff] would have done but for [the defendant's conduct] and what those actions would have reasonably produced.'" *Id.*

(quoting *Christians*, 733 N.W.2d at 813).  Moreover, if the plaintiff alleges that it could have attained more favorable terms but for the defendant's conduct, it must provide evidence that the other party to the transaction would have actually accepted those terms. *Id.* at 742 (finding that a plaintiff could not establish but-for causation because he did not offer evidence showing that the other party to the transaction "would have been willing to accept" the more favorable terms).

Here, the premise of Exergy's crossclaims is that but for Hawley Troxell's allegedly deficient conduct, it would have obtained one of two more favorable outcomes: either Article 9 would have applied to the 99-unit transfer, and Exergy would have preserved its investment through a foreclosure sale, or Exergy would have declined to enter into the transaction altogether and instead would have preserved its investment by taking the project into bankruptcy.  And in either case, Exergy would have avoided the need to litigate its rights against Fagen in this lawsuit.  Yet even if the Court were to assume that Hawley Troxell's conduct was in some manner negligent or constituted a breach of contract, Exergy has not introduced any concrete evidence to show that any of these more favorable outcomes would have actually occurred.

First, no reasonable jury could find that Fagen would have agreed to a deal within the scope of Article 9 with regard to the 99-unit transfer.  When Exergy and Fagen executed the Big Blue Transaction, Exergy needed to post a letter of credit to a wind-turbine manufacturer, but Exergy lacked the financial resources to do so on its own. Exergy's managing member, James Carkulis, admitted in his deposition that besides Fagen, the company "had no other conventional financing available" and could "not find

any alternative commercial means to secure the turbines at that time." (Third Carkulis Dep. at 23:3-24:7.) Fagen, meanwhile, was willing to post the letter of credit, but **only** on the condition of obtaining immediate ownership to ensure that the project would be completed before the pending federal grant deadline. Ron Fagen testified in his deposition that he did not want "to mess around with a foreclosure," "the deal was structured" to avoid foreclosure proceedings, and the "only way [Fagen was] going to move forward" was by "[t]aking ownership of [the] wind farm." (Second Fagen Dep. at 297:13-18, 303:15-19, 304:6-19.) Exergy has not offered any evidence to overcome this unambiguous deposition testimony from Carkulis and Ron Fagen, or to show that Fagen, under some set of circumstances, would have agreed to a secured transaction rather than sale.

Second, even if Exergy could show that but for Hawley Troxell's representation and the opinion letter, Article 9 would have applied to the 99-unit transfer, no reasonable jury could find that Exergy would have achieved a more favorable outcome through foreclosure proceedings. Exergy makes a conclusory assertion that it had "purchasers/financiers waiting in the wings" but offers no supporting evidence. The uncontroverted evidence instead indicates that EME pulled out of a potential deal because its "parent company had financial difficulties." (Fagen Dep. at 126:6-11.) And although the evidence suggests that Exergy and D.E. Shaw/BTMU discussed a deal, Carkulis conceded in his deposition that D.E. Shaw/BTMU's offer was "a good 8 million dollars off, with substantial risks that [he did not] think Fagen nor Exergy wanted to take." (Third Carkulis Dep. at 100:21-22.) Thus, while it is theoretically possible that Exergy

**could** have found a buyer, Exergy's claim cannot survive summary judgment on this basis.

Third, Exergy has not offered any evidence even suggesting that it would have refused to enter into the Big Blue Transaction had Hawley Troxell advised it of the "risks and consequences" of the deal. And even if Exergy could show that but for Hawley Troxell's conduct, it would have declined the deal and taken the project into bankruptcy, no reasonable jury could find that this path would have produced a more favorable outcome. Exergy has not pointed to any potential bankruptcy buyer and has not proffered any evidence that a bankruptcy sale would have netted Exergy a greater recovery than the Big Blue Transaction. Indeed, as a result of the Big Blue Transaction, Exergy received over $11 million in loan forgiveness from Fagen and avoided breaching its $16.8 million contract with the wind farm manufacturer. Had Exergy taken the project into bankruptcy, it would have foregone both of these benefits and also seriously jeopardized completing the project before the $22 million federal grant deadline, inherently making the project less attractive to a potential buyer. Exergy's speculation and conjecture as to what could have occurred through bankruptcy proceedings are insufficient to create a genuine factual dispute for trial.

Fourth, Exergy has not shown that but for Hawley Troxell's allegedly deficient representation, it would have avoided this lawsuit. As noted above, Exergy has failed to establish that Fagen would have agreed for the 99-unit transfer to fall within the scope of Article 9 or that Exergy itself would have foregone a deal and opted for bankruptcy – two routes that could have averted the present litigation. Moreover, to the extent Exergy

contends that it never would have brought its counterclaims against Fagen in the first place but for Hawley Troxell's advice and representation, that argument is belied by the fact that Exergy has continued to press virtually all of its counterclaims against Fagen even after Hawley Troxell withdrew and Exergy retained replacement counsel.[4] (*Compare* Exergy's Answer and Countercl. ¶¶ 22-48, Dec. 19, 2012, Docket No. 23, *with* Am. Countercl. ¶¶ 28-66.)

Overall, because there is insufficient evidence of but-for causation, the Court finds that Exergy's legal malpractice crossclaims, including those for professional negligence and breach of contract, cannot succeed and must be dismissed.

## 2.      Breach of Fiduciary Duty

Exergy's breach-of-fiduciary-duty claim – based on the same factual allegations as its professional malpractice claim, outlined above – also cannot succeed.   Under Minnesota law, an attorney has a fiduciary "duty to represent the client with undivided loyalty, to preserve the client's confidences, and to disclose any material matters bearing upon the representation of these obligations." *STAR Centers, Inc. v. Faegre & Benson,*

---

[4] In its briefing, Exergy also appears to allege that Hawley Troxell committed legal malpractice by negligently advising Exergy to stipulate to Fagen's ownership of the 99 units in Exergy Minnesota early in this litigation, which caused Exergy to lose the ability to challenge that ownership later on.  But this allegation cannot support a legal malpractice claim because a party who alleges that his or her attorney's conduct caused damage to an existing cause of action must show that he or she "had a meritorious cause of action originally." *Fiedler v. Adams*, 466 N.W.2d 39, 42 (Minn. 1991) (quoting *Hill v. Okay Constr. Co.*, 252 N.W.2d 107, 117 (Minn. 1977)).  Exergy cannot make this showing because it has stipulated that the 99-unit transfer was not subject to Article 9, and it has not cited any other grounds to show that it could have succeeded in establishing ownership over the 99 units but for Hawley Troxell's advice that it enter into the stipulation.

*L.L.P.*, 644 N.W.2d 72, 77 (Minn. 2002) (quoting *Rice v. Perl*, 320 N.W.2d 407, 410 (Minn. 1982)).   Here, even if the Court were to assume that Hawley Troxell was negligent by giving deficient advice regarding the applicability of Article 9, by failing to advise Exergy on the risks and consequences of the Big Blue Transaction, and by issuing a contradictory opinion letter for Fagen, nothing about this evidence supports Exergy's assertion that Hawley Troxell acted fraudulently, in bad faith, with divided loyalty, in broken confidence, or without disclosing material matters.   Exergy's evidence, accepted as true, does not amount as a matter of law to a breach of fiduciary duty by Hawley Troxell.   The Court will thus grant summary judgment for Hawley Troxell on this portion of Exergy's crossclaim.

### B.      Reimbursables Crossclaim

Exergy next alleges that Hawley Troxell committed legal malpractice by failing to negotiate a written side agreement with Fagen for $18 million worth of reimbursables as a part of the Big Blue Transaction.   Hawley Troxell argues that it is entitled to summary judgment on this claim because Exergy has not offered evidence of but-for causation, and the Court concurs.   As noted above, when a plaintiff alleges that it could have attained more favorable terms in a transaction but for its attorney's conduct, the plaintiff must provide evidence that the other party to the transaction would have accepted those terms. *Schmitz*, 783 N.W.2d at 742.   Here, Exergy has not offered any evidence even suggesting that Fagen would have agreed to pay Exergy an additional $18 million on top of the $11 million in loan forgiveness and the $16.8 million letter of credit that it already agreed

to.  Because there is insufficient evidence of but-for causation, the Court will grant summary judgment for Hawley Troxell on this portion of the crossclaim.

### C.    Billing Statements Crossclaim

Exergy lastly asserts that Hawley Troxell breached its fiduciary duty of loyalty to Exergy by submitting partially inaccurate billing statements to Fagen without Exergy's prior knowledge or consent.  For the reasons outlined below, the Court finds that there are genuine issues of material fact precluding summary judgment.

As stated above, an attorney has a fiduciary "duty to represent the client with undivided loyalty, to preserve the client's confidences, and to disclose any material matters bearing upon the representation of these obligations."  *STAR Centers, Inc.*, 644 N.W.2d at 77 (quoting *Rice*, 320 N.W.2d at 410).  In particular, an attorney must "communicate to his client whatever information he obtains that may affect the interests of his client in respect to the matters entrusted to him."  *Id.* (quoting *Selover v. Hedwall,* 184 N.W. 180, 181 (Minn. 1921)).  Here, Exergy has offered evidence sufficient to show, for the purposes of surviving summary judgment, that Hawley Troxell violated its fiduciary duty of loyalty.  Evidence in the record indicates that Hawley Troxell sent billing statements directly to Fagen without first obtaining Exergy's authorization. (Ascheman Decl., Exs. 45, 46, 47.)  And notably, this occurred after Fagen had already commenced its declaratory judgment action against Exergy, for which Hawley Troxell was still representing Exergy.  Exergy has also pointed to evidence that these billing statements misstated the amounts that Exergy had already paid to Hawley Troxell and

contradicted billing statements that Exergy itself had submitted to Fagen.  (*Id.*, Exs. 44, 46, 47; Rosa Decl., Ex. A at 155:15-161:13.)   Based on this evidence, a reasonable jury could conclude that Hawley Troxell failed to communicate to Exergy important matters affecting Exergy's interests and placed its own interests – getting paid – ahead of the interests of its client, Exergy.

Hawley Troxell argues that summary judgment is nevertheless warranted because Exergy has not supported its claim with expert testimony.  The Court, however, is not persuaded.  While it is true that expert testimony is sometimes required for breach-of-fiduciary-duty claims, expert testimony is not required "when the issues are 'within an area of common knowledge.'"  *Blatz v. Allina Health Sys.*, 622 N.W.2d 376, 388 (Minn. Ct. App. 2001) (quoting *Hestbeck v. Hennepin Cty.*, 212 N.W.2d 361, 364 (Minn. 1973)) (analyzing the necessity of expert testimony for a claim alleging negligence by paramedics).  In this case, the Court finds that Exergy's allegations are within an area of common knowledge – a law firm should not disclose its client's billing statements to the client's litigation adversary for the purpose of getting paid without first obtaining the consent of the client and without ensuring that the billing statements are accurate.

The Court will therefore deny Hawley Troxell's summary judgment motion to the extent it seeks dismissal of Exergy's billing statement breach-of-fiduciary-duty claim.

## IV.  FAGEN'S THIRD-PARTY CLAIM AGAINST HAWLEY TROXELL

Fagen brings third-party claims against Hawley Troxell, alleging that the law firm committed professional negligence by opining in the March 13 opinion letter that Fagen

owned 99 membership units in Exergy Minnesota as a result of the Big Blue Transaction, but then bringing conflicting counterclaims on Exergy's behalf asserting that Fagen held merely a security interest in the 99 units.  Fagen describes its claims as follows:

> Hawley Troxell cannot be correct both in its Opinion that Fagen owned the wind farm and in its Counterclaim that Fagen did not own the wind farm. If Exergy succeeds on its claim against Fagen under the UCC, then Hawley Troxell's Opinion is erroneous and negligent.  If Fagen prevails on the UCC issue, then Hawley Troxell is liable to Fagen for bringing a claim against Fagen contrary to Hawley Troxell's legal advice to Fagen. . . . In that case, Hawley Troxell would be liable to Fagen for the litigation expenses incurred by Fagen in defending against the UCC claim.

(Fagen's Opp'n to Mot. for Summ. J. at 4, 4 n.2, Jan. 5, 2016, Docket No. 417.)  Hawley Troxell has now moved for summary judgment, and the Court will grant its motion for the reasons discussed below.

First, to the extent Fagen's claim is based on the potential success of Exergy's UCC-based counterclaims against Fagen, that portion of the claim is now moot because Exergy has stipulated that the transfer of the 99 units was a sale and not a secured transaction, and it has withdrawn its counterclaims alleging otherwise.  Accordingly, even if the Court were to accept as true that the opinion letter was in some manner negligently drafted and that Fagen relied on the letter in electing to forego foreclosure proceedings, Fagen cannot show that it suffered any damages based on this reliance –

Fagen will not be held liable to Exergy for failing to foreclose on the 99 units because Exergy is no longer pressing that claim.[5]

The only aspect of Fagen's claim still at issue is thus whether Hawley Troxell was professionally negligent for filing allegedly contradictory counterclaims against Fagen on Exergy's behalf.  The Court answers this question in the negative.  While Hawley Troxell unquestionably owed Fagen a duty of care in drafting and rendering the opinion letter, *see McIntosh Cty. Bank v. Dorsey & Whitney, LLP*, 745 N.W.2d 538, 548 (Minn. 2008) (finding that a law firm owes a duty to non-clients who are direct and intended third-party beneficiaries of legal services), Fagen has not cited, and the Court cannot find, any authority supporting the proposition that this duty extended to prevent Hawley Troxell from filing counterclaims for Exergy during this litigation.  At most, evidence that Hawley Troxell asserted contradictory counterclaims for Exergy could be used to show that the opinion letter was negligently drafted – Hawley Troxell presumably could not have exercised reasonable care in rendering its opinion if it advocated a contrary position once litigation arose.  But the mere fact that Hawley Troxell may have asserted contradictory counterclaims for its client does not, in and of itself, constitute professional negligence vis-à-vis Fagen.  Hawley Troxell did not owe Fagen a duty to

---

[5] To the extent Fagen argues that Hawley Troxell is still liable for litigation expenses that Fagen incurred before Exergy withdrew the at-issue counterclaims, the Court also rejects that argument.  Fagen may have been entitled to rely on the opinion letter in electing to forego foreclosure proceedings.  But Fagen could not reasonably rely on the opinion letter for the proposition that Exergy would never bring claims against Fagen challenging the 99-unit transfer. And as explained below, Hawley Troxell did not owe a duty to Fagen to refrain from pressing contradictory counterclaims on Exergy's behalf.

refrain from pressing those counterclaims because of its earlier opinion letter, and absent such a duty, Hawley Troxell is immune from liability to Fagen based on well-established Minnesota law.

In Minnesota, an attorney acting within the scope of his or her employment as an attorney is liable for professional negligence **only** to a person with whom the attorney has an attorney-client relationship and is immune from liability to third persons for actions arising out of that professional relationship, unless (1) the third party was a direct and intended beneficiary of the attorney's services or (2) the attorney was dominated by his or her own personal interest or knowingly participated with the client in the perpetration of a fraudulent or unlawful act.  *Id.*; *Marker v. Greenberg*, 313 N.W.2d 4, 5 (Minn. 1981); *McDonald v. Stewart*, 182 N.W.2d 437, 440 (Minn. 1970).  Here, Hawley Troxell and Fagen did not have an attorney-client relationship when the firm filed the at-issue counterclaims; Hawley Troxell prepared the counterclaims in its capacity as counsel for Exergy; the counterclaims arose solely out of Hawley Troxell's professional relationship with Exergy; Fagen was not a direct and intended beneficiary of the counterclaims; and Fagen has not put forth any evidence that Hawley Troxell, in asserting the counterclaims for Exergy, was dominated by its own personal interest or conspired with Exergy to commit fraud or some other unlawful act.  Thus, although Fagen concededly incurred litigation expenses defending against Exergy's counterclaims before they were withdrawn, Fagen has no recourse against Hawley Troxell.

The Court will accordingly grant Hawley Troxell's motion for summary judgment and dismiss Fagen's third-party complaint.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Exergy's Motion for Summary Judgment [Docket No. 400] on Counts I, IV, V, VI, and VII of its Amended Counterclaim against Fagen and Count I of its Crossclaim against Hawley Troxell is **GRANTED in part** and **DENIED in part**, as follows:

      a.      The motion as to Count I of its Amended Counterclaim against Fagen on the issue of liability is **GRANTED**.  The motion as to Count I on the issue of damages is **DENIED**.

      b.      The motion is **DENIED** in all other respects.

2.      Fagen's Motion for Summary Judgment [Docket No. 393] on Exergy's Amended Counterclaim is **GRANTED in part** and **DENIED in part**, as follows:

      a.      The motion as to Count III of Exergy's Amended Counterclaim, to the extent Exergy alleges that Fagen committed breach of contract by removing Exergy as managing member of Exergy Minnesota and by removing James Carkulis and others from their officer positions with Exergy Minnesota, is **GRANTED**.  That count is **DISMISSED with prejudice**.

b.      The motion as to Count IV of Exergy's Amended Counterclaim, to the extent Exergy alleges that Fagen breached fiduciary and contractual duties by removing Exergy as managing member of Exergy Minnesota and by removing James Carkulis and others from their officer positions with Exergy Minnesota, is **GRANTED**.  That count is **DISMISSED with prejudice**.

c.      The motion as to Counts V, VI, and VII of Exergy's Amended Counterclaim is **GRANTED**.  Those counts are **DISMISSED with prejudice**.

d.      The motion is **DENIED** in all other respects.

3.      Hawley Troxell's Motion for Summary Judgment [Docket No. 375] on Exergy's Crossclaims is **GRANTED in part** and **DENIED in part**, as follows:

a.      The motion is **DENIED** with respect to Exergy's billing statement breach-of-fiduciary-duty claim.

b.      The motion is **GRANTED** in all other respects.   Exergy's other crossclaims are **DISMISSED with prejudice**.

4.      Hawley Troxell's Motion for Summary Judgment [Docket No. 384] on Fagen's Third-Party Complaint is **GRANTED**.  Fagen's Third-Party Complaint against Hawley Troxell is **DISMISSED with prejudice**.


DATED:  September 29, 2016                   _____ s/ John R. Tunheim _____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                                     Chief Judge
                                                      United States District Court